John J. CUNEO, Regional Director, etc., National Labor Relations Board, Petitioner,

v.

The ESSEX COUNTY AND VICINITY DISTRICT COUNCIL OF CARPENTERS AND MILLWRIGHTS, UNITED BROTHERHOOD OF CARPENTERS & JOINERS OF AMERICA, AFL-CIO, Respondent.

Civ. A. No. 585-62.

United States District Court
D. New Jersey.
Aug. 16, 1962.

Bernard L. Balicer, Howard I. Grossman, Washington, D. C., with N.L.R.B., and Stanley A. Mestel, (Wyoming Bar), Washington, D. C., for petitioner.

Joseph P. Dunn, Newark, N. J., and Robert D. Corbin, Jersey City, N. J., for respondent.

WORTENDYKE, District Judge.

Pursuant to the provisions of section 10(l) of the National Labor Relations Act, 1947, (Act), 29 U.S.C.A. § 160(l), the Regional Director (Petitioner) of the Twenty-Second Region of the National Labor Relations Board (Board) has petitioned this Court for a preliminary

injunction pending the final disposition by the Board of the complaint of Associated Contractors of Essex County, Inc. (Association) charging the Essex County and Vicinity District Council of Carpenters and Millwrights of the United Brotherhood of Carpenters and Joiners of America, AFL–CIO (Carpenters or Council) with an unfair labor practice in violation of 29 U.S.C.A. § 158(b) (4) (i) (ii) (A). More particularly, the Association charged the Carpenters before the Board with having exerted pressures to compel Association to enter into a so-called "hot cargo" contract. The pressures complained of are alleged to consist of a strike called by the Carpenters on July 23, 1962 against certain members of Association who are engaged in building construction, an industry affecting commerce, as defined in section 501 of the Act, 29 U.S.C.A. § 142(1).

Carpenters is a labor organization engaged within this District in transacting business and protecting the interests of its employee-members, and of employee-members of affiliated and constituent labor organizations. Association is a membership corporation, representing the interests of and acting as bargaining agent for certain construction contractors doing business in this District.

Commencing in April, and continuing into July 1962, Association and Council negotiated between themselves for a collective bargaining agreement to replace a similar agreement between the parties which by its terms expired May 31, 1962. That previous agreement contained a clause which Carpenters demanded should be included in the new collective bargaining agreement under negotiation, but Association refused to consent to such inclusion. The language of the clause in question, which constitutes a part of Article 18.1 of the old contract, is as follows:

"* * * No cessation of work shall take place for any reason except for non-union condition or failure to make required payments to the Pension Plan and/or Welfare Fund. A non-union condition shall prevail when employees are employed without a collective bargaining agreement on any construction work which is normally performed by employees working under a collective bargaining agreement with a Union affiliated with the Building Trades Department of the AFL–CIO. In such event it shall not be deemed a violation of this Agreement for employees hereunder to individually refuse to work on the job site where such non-union condition exists. To the extent legal, the Union may request employees hereunder to leave such job."

All demands of the respective negotiators, except this demand of Council for the inclusion of the foregoing quoted language in the new contract were amicably resolved. The strike which commenced on July 23, 1962 was called because of the Association's refusal to agree to such inclusion, and the consequent failure of a collective bargaining agreement to come into existence.

The Petitioner contends, and the complaint of the charging party to the Board alleges that the calling and maintenance of the strike constitutes an unfair labor practice in violation of 29 U.S.C.A. § 158(b) (4) (i) (ii) (A). The pertinent language of the Act relied upon by the petitioner is as follows:

Section 158 "(b) It shall be an unfair labor practice for a labor organization or its agents— * * *

* * * * * *

"(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in * * * an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to * * * perform any services; or (ii) to threaten, coerce, or restrain any person engaged in * * an industry affecting commerce, where in either case an object thereof is—(A) forcing or requiring any employer * * * to enter into any

agreement which is prohibited by section [158] (e) of this section; * * *.

* * * * * *

Section 158 "(e) It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement * * * whereby such employer ceases or refrains, or agrees to cease * * * doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void; Provided, that nothing in this subsection (e) shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting or repair of a building, structure, or other work: * * Provided further, That nothing in this Act shall prohibit the enforcement of any agreement which is within the foregoing exception."

It is further the contention of the Petitioner that the construction industry proviso contained in the foregoing quoted language of the Act merely exempts from the ban of the section entering into an agreement of the type specified in the proviso but does not exempt conduct of unions in the construction industry which is proscribed by the provisions of section 8(b) (4) (A) of the Act (as the third proviso under section 8(e) (which is deleted from the above quotation) does for the unions in the garment industry). Petitioner says that "the proviso merely saves from the ban of section 8(e) limited voluntary agreements restricting the business relations of employers in the construction industry." In sum, Petitioner argues that the unfair labor practice of which the charging party complains consists in the calling of a strike as a means of enforcing the inclusion of the questioned clause in the new agreement.

From the evidence presented before me, I make the following findings of fact:

1. The Respondent, The Essex County and Vicinity District Council of Carpenters and Millwrights of the United Brotherhood of Carpenters and Joiners of America, AFL–CIO, is a labor organization as defined in section 2(5) of the National Labor Relations Act, 29 U.S.C.A. § 152(5).

2. The complainant before the Board, Associated Contractors of Essex County, Inc. is an employer as defined by section 2(2) of the Act.

3. Council has acted and is authorized to act in behalf of employees (as defined by section 2(3) of the Act) of members of Association within the area generally comprising Essex County, New Jersey, in conducting collective bargaining negotiations, and entering into and performing collective bargaining agreements with Association.

4. Association has conducted and is authorized to conduct, in behalf of its members, who are employers engaged in industry affecting commerce and operating within the Essex County, New Jersey area, collective bargaining negotiations with Council, and the execution and performance of collective bargaining agreements with Council relating to the employment of members of Council in building construction and other related operations conducted by members of Association.

5. Members of Association maintain their places of business and conduct their operations within this District. They purchased goods and materials from outside of the State of New Jersey for use in construction projects within the State valued in excess of $50,000 during 1961, and during the same period performed services and supplied materials outside of the State of New Jersey in excess of a million dollars in value.

6. On and prior to April 19, 1962, there was in force and effect between Association and Council a written collective bargaining agreement which became

effective June 1, 1959 (although dated September 1959), and by its terms was to continue to midnight on May 31, 1962 "and thereafter from year to year" unless either party notified the other in writing at least three months prior to May 31, 1962 of termination or modification of the agreement.

7. Included among the provisions of the foregoing contract was Article XVIII, containing provisions in section 1 thereof as quoted supra (page 2 of this opinion).[1]

8. In February 1962, in accordance with Article 6 of the then existing agreement, Carpenters served upon Association written specifications of their demands for provisions to be embodied in a new agreement to supercede the existing agreement. On April 19, 1962, Association submitted to Council its written demands for the new agreement, and invited Council to commence negotiations of the respective demands on and after April 23, 1962. No reference to the language of Article 18 of the old contract was contained in the written demands submitted by either party to the other.

9. Commencing on April 25, 1962, meetings were held by the respective bargaining committees of the parties to the old contract for the purpose of negotiating the demands of both parties for the new agreement. Article 18 of the old contract was not discussed at the meeting of April 25th, nor at a subsequent meeting held for a similar purpose on May 31, 1962.

10. At another meeting of the negotiators, held on June 1, the discussion did include references to the provisions of Article 18, in the course of examining the language of the contract, article by article. At that meeting the representatives of Association objected to the inclusion in the prospective new agreement of a portion of the language of Article 18 of the old agreement, as quoted above. Council's negotiating committee insisted that this language be retained.

11. At the conclusion of the negotiations between the respective bargaining

1. The complete text of Article XVIII is as follows:

"ARTICLE XVIII—Strikes, Lockouts and Arbitration.

"Section 1. All disputes or complaints of whatsoever character, except jurisdictional disputes covered in Article XVII (Jurisdictional Disputes), if not adjusted by the subordinates involved, shall be referred to a joint committee of the Union and the Association for settlement. The decision of such committee shall be final and binding, If such committee is unable to agree on the subject in dispute, it shall, as soon as possible, be arbitrated by an Arbitrator designated by the New Jersey State Board of Mediation and the decision of the Arbitrator shall be final and binding. Cost of the Arbitrator shall be equally shared by the parties. Either party may request such arbitration without resort to the aforesaid Joint Committee. No cessation of work shall take place for any reason except for non-union condition or failure to make required payments to the Pension Fund and/or Welfare Fund. A non-union condition shall prevail when employees are employed without a collective bargaining agreement on any construction work which is normally performed by employees working under a collective bargaining agreement with a Union affiliated with the Building Trades Department of the AFL-CIO. In such event it shall not be deemed a violation of this Agreement for employees hereunder to individually refuse to work on the job site where such non-union condition exists. To the extent legal, the Union may request employees hereunder to leave such jobs.

"Section 2. Should any Employer violate this Agreement, such violation shall be immediately submitted to the Joint Committee or the Arbitrator above referred to. Said Committee shall meet within 48 hours and proceed forthwith to make a thorough investigation, consider all the facts and evidence presented and thereupon to render a decision. If the Employer is found to have violated this Agreement by the Joint Committee or by the Arbitrator, then such Joint Committee or the Arbitrator, as the case may be, shall order an appropriate adjustment and the Association shall, to the extent and in the manner permitted by applicable law, designate the employees for the work covered hereunder, on all jobs of the Employer for one (1) year. Any violation of this section shall render this Agreement void as to the Employer violating same."

committees on June 1, the negotiators could not achieve a meeting of the minds on wages and certain other provisions, and notice was given by the representatives of Council to the bargaining committee of Association that a strike would be called on Monday, June 4, 1962, which commenced on that date.

12. On June 11, a meeting was held by representatives of the respective negotiating parties, upon the invitation of an official representative of United Brotherhood of Carpenters and Joiners of America, AFL–CIO, the International organization with which Council is affiliated, at which meeting economic demands, and the language of Article 18 were further discussed, without achievement of any agreement between the parties.

13. Further negotiations were held between the bargaining committees at another meeting which commenced on June 19th and continued into the early morning hours of June 20. Only economic issues were discussed at that meeting, and at its termination an agreement was reached which justified Council's committee in believing that all matters in difference between the negotiators had been finally resolved. Council was induced by this belief to terminate the strike on June 20.

14. A short form of interim agreement, embodying the terms of the agreement reached by the bargaining representatives on June 20 was prepared by the attorney for Council and submitted to Association on June 22, 1962. Upon receipt of this draft of short form agreement, Association caused to be drafted a plenary contract which was thereupon submitted to the attorney for Council for approval and execution. The latter draft contained, *inter alia*, a provision or provisions rendering the wage increases, which had been agreed upon, effective on and with June 20th. Council objected, and insisted upon June 2 as the commencement date. Thereafter Council submitted a further draft of agreement providing that the wage increases should become effective on June 2, and including the language of Article 18 of the old contract to which Association had objected. Council demanded that its draft of agreement be executed, under threat of calling a strike of its members working on construction projects upon which certain members of Association were then engaged.

15. A meeting of the negotiators was held on June 23, 1962, at which the commencement date for the wage increases, a provision limiting the time for a non-union employee to join the union, and the wage status of foremen were discussed. Article 18 was also a subject of the discussion at that meeting, and the representatives of Association flatly refused to agree to its inclusion in the new agreement.

16. At a further meeting of the representatives of the negotiating parties, held on July 19th at the office of the attorney for Council, the proposed language of Article 18 was again discussed and the representatives of Council insisted upon its inclusion in the new contract. Upon Association's rejection of this request, Council threatened a new strike, which commenced on July 23, 1962, and which still continues.

17. During the negotiating conferences, by June 4, 1962, new collective bargaining agreements, in form proposed by Council, were executed by 50 employer-contractors engaged in the building construction industry in the Essex County area, including three contractors who are or were members of Association. To the date of the hearing before me on the present petition, approximately 146 similar collective bargaining agreements had been executed by construction contractors with Council, which covered approximately 900 carpenter-employees.

18. The strike which commenced on July 23, 1962 affected only 4 (out of a total of 50) contractor-members of Association, and one of these four subsequently signed a form of new collective bargaining agreement, conforming to the requirements of Council, which resulted in a termination of the strike as to that

contractor. Of the carpenter employees represented by Council, only 23 persons employed by 3 contractor-members of Association were on strike at the conclusion of the hearing on the return of the order to show cause in this case.

19. In 1960 the carpenters struck on a hospital construction job in Newark, New Jersey, invoking the contract clause here in question, because the general contractor had subcontracted a portion of the work to a subcontractor employing workers belonging to a union not recognized by the Carpenters. No unfair labor charge was brought by Association against Carpenters on that account, and that strike was settled by the parties forthwith.

20. Council construes the questioned clause as permitting a strike for non-union condition only "to the extent legal."

21. Article 19 of the agreement provides that nothing contained therein is intended to be in conflict with any law, and that if conflict be found the law shall prevail and the agreement shall be deemed amended to conform with such law.

## DISCUSSION

This Court has jurisdiction under section 10(l) of the Act, to entertain the petition of the Regional Director for a temporary injunction.

The Regional Director contends that the strike called by Council, which commenced July 23, 1962 and still persists against three members of Association, is an unfair labor practice within the meaning of the language of section 8(b) (4) (i) (ii) (A) of the Act, as amended September 14, 1959 by PL 86–257, Title II, § 201(e), Title VII, §§ 704(a)–(c), 705 (a), 73 Stat. 525, 542, 545. More specifically, it is the contention of the Petitioner that the respondent labor organization has engaged and is engaging in a strike having as an object thereof forcing Association to enter into an agreement prohibited by subsection (e) of section 8 of the Act, as amended. Subsection (e) (supra) makes unlawful the entry into an agreement between a labor organization and an employer "whereby such employer * * * agrees to cease * * * doing business with any other person," and renders any such agreement previously or thereafter entered into unenforceable and void to that extent. However, the same subsection (e) *expressly provides that nothing contained in that subsection* "shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, * * *."

There appears at the outset a remarkable inconsistency between the allegations of the *Petition* for injunction under section 10(l) and those of the *Complaint* of the charging party to the Board, of which a copy is annexed to the Petition. The charging party's complaint was filed with the Board on June 4, 1962. It alleges that "*Since on or about June 1, 1962 and at all times thereafter,* the * * * labor organization has engaged, induced or encouraged employees of employer members of the Associated Contractors of Essex County, Inc. and employees of other employers, to engage in a strike or a refusal in the course of their employment to perform services for any of the employer members of the Associated Contractors of Essex County, Inc.; and threatened, coerced, or restrained said employers; and object thereof being to force said employers to enter into *an agreement which is prohibited by Section 8(e)*." The foregoing allegations find no support in the evidence before me.

The Petition of the Regional Director charges that, in support of Respondent's demand for inclusion of Article 18 in the collective bargaining agreement under negotiation, Respondent called a strike on July 20, 1962, and, since on or about July 23, 1962, has been engaged in such a strike; and that an object of the strike which was threatened on July 20 and commenced on July 23, was to force the Association to enter into an agreement prohibited by section 8(e) of the Act. Therefore, says the Board, that strike

constitutes a violation of section 8(b) (4) (i) (ii) (A) of the Act.

The strike referred to in the complaint of the charging party as having commenced on *June 1*, 1962, actually commenced on June 4, 1962, and it was amicably settled and terminated on June 20, 1962. It was not until the Association refused, on July 20th, to execute a form of collective bargaining agreement which contained Article 18, that the strike which the Petitioner seeks to restrain commenced, and that was on *July 23*, 1962. However, for the purposes of this opinion, I treat the strike which commenced on July 23, 1962 as related to that complained of by the charging party which commenced on June 4, 1962. See National Licorice Co. v. N. L. R. B., 1940, 309 U.S. 350, 369, 60 S.Ct. 569, 84 L.Ed. 799; N. L. R. B. v. Fant Milling Co., 1959, 360 U.S. 301, 79 S.Ct. 1179, 3 L.Ed.2d 1243.

It is strongly urged by Respondent that the refusal of the Association to enter into a collective bargaining agreement containing Article 18 was not in good faith, but was employed in an attempt to obtain concessions from respondent respecting its economic demands, after such demands had been agreed upon by the Association's bargaining committee. Cf. N. L. R. B. v. Truitt Mfg. Co., 1956, 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027. Indeed the exclusion of any part of Article 18 from the new contract was not among the written demands submitted in behalf of the Association for bargaining purposes. However, the good faith issue, if it exists, is of secondary concern in this case, because I find from the evidence that the strike which the Petitioner seeks to have enjoined was not and is not an unfair labor practice within the meaning of the statute upon which the charging party and the Petitioner base their contentions to the contrary.

The contentions of the Petitioner pose three questions:

(1) Does the language which Council insists upon having included in the new collective bargaining agreement relate to contracting or subcontracting of construction work to be done at the site of the construction?

(2) If the language does so relate, does its inclusion in the collective bargaining agreement constitute an unfair labor practice?

(3) Is the employment of a strike to force the inclusion of the disputed language in the new agreement an unfair labor practice within the meaning of the statutory language relied upon by the Petitioner?

While this Court is called upon only to determine whether or not the Board has reasonable cause to believe that an unfair labor practice exists, if, as a matter of *law* it conclusively appears that such an unfair labor practice is non-existent, this Court must deny the injunctive relief petitioned for. In determining whether there is any basis for believing that an unfair labor practice exists, we are bound by the provisions of the 1959 amendment to the Taft-Hartley Act, which became effective on November 13 of that year. That amendment added to section 8 a new subsection designated as (e). That new subsection declared it to be an unfair labor practice for an employer and a union to enter into an agreement whereby the employer promised to cease doing business with any other person and declared that any such agreement would be unenforceable and void. However, the same subsection (e), contains a proviso that nothing contained in *subsection (e)* applies to an agreement between parties in the *construction industry* relating to the contracting or subcontracting of work to be done at the site of the construction. The provisions of Article 18 to which the Association objects and upon which the Respondent insists constitute a portion of an agreement between parties in the construction industry relating to contracting or subcontracting of work to be done at the site of the construction. Therefore, the clause in question is a perfectly lawful provision and consequently its inclusion does not constitute an unfair labor practice, nor render the proposed agreement

unenforceable. A further effect of the 1959 amendment to the Act was a modification of subsection 8(b) (4) (A) of the original Act by substituting, for the language proscribing a strike having as an object the *forcing of an employer to cease doing business with any other person,* language proscribing a strike having as an object the *forcing of an employer to enter into an agreement proscribed by subsection (e).* Since subsection (e) of the amended Act by its terms expressly excepts a contract such as that with which·we are here concerned, the strike to force the inclusion of the clause in the contract is, in my opinion, not an unfair labor practice. The employment of coercion (strike) to secure the inclusion of a *lawful* clause in a collective bargaining agreement is no more an unfair practice than would be the employment of similar pressure to obtain the inclusion of a higher wage rate in such an agreement. 29 U.S.C.A. § 163; N. L. R. B. v. International Rice Milling Co., Inc., 1951, 341 U.S. 665, 672, 71 S.Ct. 961, 95 L.Ed. 1284.

The language in dispute does not constitute a "hot cargo" clause. See Schauffler v. Brewery and Beer Distributor Drivers, D.C.Pa.1958, 162 F.Supp. 1, at page 10. As is indicated in its catchline (see footnote 1 supra), Article 18 relates to Strikes, Lockouts and Arbitration. The parties agree that there shall be no cessation of work for any reason except for a non-union condition or failure to make required payments to the pension fund and/or welfare fund. The term "non-union condition" is therein defined in the language which is the present bone of contention, as a situation in which "employees are employed without a collective bargaining agreement on any construction work which is normally performed by employees working under a collective bargaining agreement with a union * * *." This language in effect would require the contractors to exclude non-union employees from the construction job site. If such non-union employees are permitted to work at the site, it is stipulated that employees bound by

the proposed agreement may refuse to work, and "to the extent legal" the Union may request employees to leave their jobs. In short, the inclusion of the critical language would permit employee members of Council to refuse to work alongside of non-union employees at any job site, without thereby violating the provisions of the agreement.

Among the authorities upon which Petitioner relies to support his contention that the existing strike constitutes an unfair labor practice are Local 1976, United Brotherhood of Carpenters, etc. v. N. L. R. B., 1958, 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186; N. L. R. B. v. Local 47, International Brotherhood of Teamsters, etc., 5 Cir. 1956, 234 F.2d 296; Kennedy for and on Behalf of N. L. R. B. v. Construction, etc. Laborers, etc., D.C.Ariz.1961, 199 F.Supp. 775; and Construction etc. Laborers, etc. v. Independent Contractors Association, 7/26/62, 137 NLRB No. 149, 31 LW 2083 (8/7/62).

Local 1976, supra, is frequently referred to as the "Sand Door" case, and dealt with the effect of "hot cargo" provisions in collective bargaining agreements. In that case, the collective bargaining agreement between the Union and two general contractors engaged in constructing a hospital, contained a provision that "workmen shall not be required to handle non-union material." Members of the Local refused to hang doors manufactured by a non-union supplier. The distributor of the doors (Sand), filed a complaint with the N. L. R. B. charging the Union with an unfair labor practice by reason of its concerted refusal to hang the doors, and calling of a strike by reason of the contractor's use thereof. It was the object of that strike to force the contractor to cease doing business with the supplier of the doors. The Board issued a cease-and-desist order against the Union which was enforced by the Court of Appeals, 9 Cir., 241 F.2d 147. On certiorari the Supreme Court affirmed the judgment of the Court of Appeals enforcing the cease-and-desist order of the

Board. In reaching its conclusion, the Supreme Court construed the language of § 8(b) (4) (A) as it then existed (before the amendment of 1959), and concluded that despite the existence of the contractual provision in the master agreement permitting employees thereunder to refuse to handle non-union goods, that provision could not be used by the Unions as a defense to a charge of inducing employees to strike or refuse to handle goods for objectives proscribed by the Act. The language of the statutory proscription, as it then existed, 29 U.S.C.A. § 158(b) (4) (A), provided that "it shall be an unfair labor practice for a labor organization or its agents— * * * to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer * * * to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, * * * or manufacturer, or to cease doing business with any other person; * * *." The 1959 amendment completely changed the language of subdivision (A) of section 158(b) (4), by making it an unfair labor practice for a labor organization to engage in a strike, an object of which is "(A) forcing or requiring any employer * * * to enter into any agreement which is prohibited by subsection (e) of this section; * * *." However, subdivision (B) of the same section in the 1959 amendment incorporates (and supplements) the language previously contained in subdivision (A) of the old Act. In the petition presently under consideration, however, no reference is made to subdivision (B) and the charge relates only to subdivision (A).

I am not unmindful of the legislative history of the Labor-Management Act of 1959 to be found in the Conference Report No. 1147, U.S.Code Cong. and Adm. News, 86th Cong., First Sess., 1959, at page 2511, relating to "hot-cargo agreements," and discussing the effect of the "Sand Door" case, supra, upon the provisions of section 8(e) of the Act. The Conference committee therein points out that the proviso relating to contracting or subcontracting of work at the site of construction "does not exempt from section 8(e) agreements relating to supplies or other products or materials shipped or otherwise transported to and delivered on the site of the construction. The committee of conference does not intend that this proviso should be construed so as to change the present state of the law with respect to the validity of this specific type of agreement relating to work to be done at the site of the construction project or to remove the limitations which the present law imposes with respect to such agreement. Picketing to enforce such contracts would be illegal under the Sand Door case * * *. To the extent that such agreements are legal today under section 8(b) (4) of the * * * Act, as amended, the proviso would prevent such legality from being affected by section 8(e). The proviso applies only to section 8(e) and therefore leaves unaffected the law developed under section 8(b) (4). * * *"

The Sand Door case, upon careful perusal, does not, in my opinion, disclose support for the contention that the presently pending strike constitutes an unfair labor practice under the Act, either before or since the 1959 amendment. The very first sentence of the opinion in Sand Door (357 U.S. 93, 78 S.Ct. 1011,) points out that it dealt with hot cargo provisions in collective bargaining agreements and raised the question whether such provisions constituted a defense to a charge against a Union of an unfair labor practice under section 8(b) (4) (A) as it read prior to the 1959 amendment. There was there involved only a question of secondary boycott, which is not a subject under consideration in the case at bar. Sand Door did not hold that members of a labor organization, in negotiating a collective bargaining

agreement with their employers, might not employ a strike as a means of forcing the employers to include in the agreements a provision that members of the Union would not be forced to work upon construction projects alongside of non-union employees of subcontractors thereon. The opinion in Sand Door states (at p. 105, 78 S.Ct. at 1019) that: "The freedom of choice for the employer contemplated by § 8(b) (4) (A) is a freedom of choice at the time the question whether to boycott or not arises in a concrete situation calling for the exercise of judgment on a particular matter of labor and business policy. Such a choice, free from the prohibited pressures—whether to refuse to deal with another or to maintain normal business relations on the ground that the labor dispute is no concern of his— must as a matter of federal policy be available to the secondary employer notwithstanding any private agreement entered into between the parties." We are not here confronted with any question as to freedom of choice in such connection, and it is very obvious that the Sand Door case relates to what is now 8(b) (4) (B) and not to 8(e) or 8(b) (4) (A), as it is now written.

A petition similar to that presently before this Court was presented to Judge Wright in Lebus, Regional Director, etc. v. Local 60 United Association of Journeymen, etc. (Plumbers), whose decision of April 14, 1961 is reported in D.C., 193 F.Supp. 392. The dispute which precipitated the proceeding before the Board in connection with which the Regional Director there sought a preliminary injunction, was the decision of a general contractor to have two of his own pipe fitter employees, who were members of the respondent Union, install cast iron pipes and pumps rather than to let out the work to a plumbing contractor in compliance with the preference of the Union. Respondent insisted that it was immaterial to it whether a union or a non-union subcontractor was selected for the work, but the Regional Director charged that the respondent's picketing

of the job site was designed to force the general contractor to enter into a prohibited "hot cargo" agreement in violation of section 8(b) (4) (A) and compel him to assign work to one craft in preference to another, in violation of section 8(b) (4) (D) of the Act, as amended. In considering the 8(b) (4) (A) charge, Judge Wright's opinion states (commencing at page 392) that:

"There is no showing whatever that the Union has ever demanded from Binnings (the general contractor) an agreement whereby the contractor would obligate himself to use only union subcontractors. The Union expressly denies any such intent and it cannot be inferred from the circumstances. On the contrary, whatever may have been its original motive, before this proceeding was initiated the Union had publicly stated its willingness to accept a non-union subcontractor for the disputed work.

"But, even if this was one of the objects of its activity, there is no violation of the Taft-Hartley Act involved. For, as already noted in LeBus v. International Union of Operating Engineers, etc., D.C.E.D.La., 188 F.Supp. 392, 396, note 5, § 8(b) (4) (A) only condemns coercive action 'forcing or requiring any employer * * * to enter into any agreement *which is prohibited* by subsection (e) of this section,' and the cited subsection expressly exempts from the general ban on socalled 'hot cargo' clauses 'an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work.' 29 U.S.C.A. §§ 158(b) (4) (A) and 158(e). There is no merit in the N.L.R.B.'s argument that the quoted proviso of subsection (e) merely sanctions *voluntarily entering into* a 'hot cargo' agreement in the con-

struction industry but does not lift the ban on coercive measures designed to *force* such a stipulation from an employer. Whatever the wisdom of the policy, the clear text of section 8(b) (4) (A) denies the union its traditional weapons only where it would use them to secure an illegal agreement, and neither § 8(e), which 'shall not apply' to such an agreement, nor any other provision, condemns the so-called 'subcontractor clause' in bargaining contracts. As the N.L.R.B. itself emphasizes, the Conference Report with regard to the proviso to § 8(e) dealing with such agreements says it was 'not intended * * * [to] change the existing law with respect to judicial enforcement of these contracts or *with respect to the legality of a strike to obtain such a contract,*' and, while either implication might be read in this language, the fact is that striking to obtain a subcontractor agreement was not illegal when the Taft-Hartley Act was amended in 1959. Local 1976, United Brotherhood of Carpenters, etc. v. National Labor Relations Board (Sand Door) 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186, * * *, had merely held that such an agreement could not be 'enforced' through a prohibited secondary boycott, but it did not condemn other lawful activity directed to persuading the employer to enter into that type of stipulation. Nothing in the original Taft-Hartley law, or in its legislative history, indicates an intent to ban such activity and there is no ground for holding that conduct illegal. It follows that the charge under § 8(b) (4) (A) is without merit." (Italic emphasis taken from text.)

On June 6, 1961 Judge Kilkenny of the District of Arizona decided Kennedy, Regional Director, etc. v. Construction, Production and Maintenance Laborers Union, etc., D.C., 199 F.Supp. 775. In that case the Regional Director had peti-

tioned the District Court for a temporary injunction pending the final disposition of a complaint before the Board on charges made by Independent Contractors Association that the defendant Construction Union was engaging in unfair labor practices within the meaning of §§ 8(b) (4) (i) (ii) (A) and (B), and 8(b) (7) (C) of the Act as amended in 1959. The sections cited are referred to by Judge Kilkenny as the "hot cargo," "organizational picketing" and "secondary boycott" segments of the Act, respectively. The District Court opinion discloses that a general contractor in the construction business in Phoenix, Arizona (Colson) was engaged in commerce as defined in the Act, upon certain projects including one referred to as the Yellow Front Project. Representatives of the respondent Union demanded recognition as representatives of Colson's employees and attempted to compel Colson to enter into a contract with the Unions represented by the respondent whereby it would be necessary that all subcontractors employed by Colson would abide by the terms of the Arizona Master Labor Agreement. That Agreement provided that if a contractor should subcontract construction work, the terms of the Master Agreement should extend to and bind that subcontracted work and that the subcontract should contain provisions requiring the subcontractor to comply with the terms of the Master Agreement. It was the contention of the Regional Director in that case that the terms of the Master Agreement, if applied to subcontractors, would force the general contractor to cease doing business with his subcontractors if they failed to comply with the Master Agreement. The picketing at the Yellow Front Project of Colson displayed signs stating that it was the general contractor who was being picketed and that its object was the organization and representation by the Carpenters' Local of the carpenters employed at the site. In discussing the "hot cargo" charge, Judge Kilkenny reviewed the legislative history of the section upon which the charge was predi-

cated and concluded that while the petitioner's contention was sound to the extent that Congress did not intend to change the rule of the "Sand Door" case, petitioner was "urging a separate violation of the 1959 'hot cargo' legislation under the provisions of (A) (e). It is quite obvious that Congress, when enacting (A) intended to proscribe only those agreements which were prohibited by subsection (e). This is the direct mandate of the legislation. Subsection (e) expressly excepts from the scope of its prohibitions those building and construction contracts and subcontracts such as here involved. The language is so clear and unequivocal that there is no reason to invoke the ordinary rules of statutory construction, nor for that matter any particular reason to use or invoke the Congressional history of the legislation." Judge Kilkenny refers with approval to Judge Wright's decision in the Plumbers' Local 60 case (supra) (193 F.Supp. 392), as rejecting the contention urged by the petitioner in the case then before him (Judge Kilkenny). The latter concludes as follows:

"While I do not fully agree with some of the language used by Judge Wright, I am convinced of the soundness of his ultimate conclusion. Petitioner has failed to show a prima facie violation of section (A)."

Judge Kilkenny did, however, find that the Board had reasonable cause to believe that the "organizational picketing" and the "secondary boycott" charges were sustainable and granted the injunction with respect to *those* labor practices, but *not* to the so-called "hot cargo" charge.

After Judge Kilkenny's decision, the Board proceeded with its investigation of the complaint of the charging party, and a majority of the Board made a cease-and-desist order which issued on July 26, 1962, and is reported in 137 NLRB No. 149 (31 LW 2083 of 8/7/62). That order directed the respondent Local to cease and desist from, *inter alia*, engaging in a strike with an object of forcing Colson "to enter into any agreement which is prohibited by section 8(e)." In reaching its conclusion, the Board's majority decision has this to say respecting the provisions of section 8(e) of the Act as amended:

"Reading section 8(e) together with section 8(b) (4) (A) in the light of the aforementioned statements by Senator Kennedy and Representative Bardan we conclude that the construction exemption in section 8(e) was not intended to remove from the reach of section 8(b) (4) picketing and other proscribed conduct which is designed to secure such contracts as are before us in this case."

The conclusion of the majority of the Board in the Local 383 case was reached because, as the language of its decision clearly states:

"If Respondent, by its picketing and oral demands, sought to have Colson sign the Master Agreement containing the clause quoted in the margin (the clause provided that the terms of the agreement should extend to and bind construction subcontractors) this contract, by its very terms, would have compelled Colson to cease doing business with * * * its nonunion subcontractors, if they would not comply with the contract's provisions. All parties recognize that this was the necessary effect of Colson's signing the Master Agreement and the Respondents made it plain to Colson that it would be expected to adhere to the contract and transfer its work to contractors who would comply with its provisions. * * * Once executed, the Master Agreement would have precluded Colson from dealing with subcontractors who would not abide by its terms and it was intended, we find, that Colson would implement the contract and cease doing business with the above mentioned nonunion subcontractors. Picketing in these circumstances was held to be for an object of forcing an employer to cease doing busi-

944

ness within the meaning of section 8(b) (4) (A) of the Act, prior to the 1959 amendments. * * *

"While the old Section 8(b) (4) (A) became section 8(b) (4) (B) by virtue of the 1959 amendments, it was not otherwise changed to the extent pertinent here. * * *

"Under all the circumstances of this case, and particularly in view of our holdings in similar cases decided under section 8(b) (4) (A) of the Act before the 1959 amendments, the retention of that section's language in the present section 8(b) (4) (B) as explained above and the strongly declared Congressional purpose to prohibit the use of secondary pressure and economic force by Unions to secure an objective such as Respondents sought by its picketing herein, we must find that Respondents' picketing of Colson violated section 8(b) (4) (i) and (ii) (A) and (B) of the Act."

Petitioner urges that this Court should recognize the construction of section 8(e) expressed by the Board in the foregoing language because "the construction of a new statute by the agency administering it is entitled to 'peculiar weight'" (citing Norwegian Nitrogen Products Co. v. United States, 1933, 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796); but the cited opinion also states "that administrative practice does not avail to overcome a statute so plain in its commands as to leave nothing for construction" (p. 315, 53 S.Ct. p. 358). I respectfully reject as a precedent here the Board's conclusion in Colson and Stevens that the agreement there in question was "prohibited by Section 8(e)" of the Act for the simple reason that the agreement presently in question is *expressly excepted* from the prohibition of that section by the proviso thereof upon which the Carpenters here rely. Moreover, the clause in dispute expressly limits the Union, in requesting employees under the agreement to leave jobs where a non-union condition exists, "to the extent

legal." And Section 2 of Article 18 would render the existence of such a non-union condition a matter for arbitration. The case before me is, in my opinion, factually parallel with the situation which confronted Judge Wright in 193 F.Supp. 392, and with that dealt with by Judge Kilkenny in disposing of the section 8(b) (4) (A) charge in 199 F.Supp. 775.

It is my conclusion, based upon the evidence which has been produced before me, and as a result of my construction of the provision of the Act upon which the charging party bases its unfair labor practice complaint, that the portion of the language of Article XVIII, section 1, to which Association objects and which Council insists upon having included in the new collective bargaining agreement is valid, and would be enforceable under the provisions of section 8(e) of the Act as amended. I also conclude that the strike which has been called by Respondent of the carpenter members who are employees of the three remaining "holdout" contractor members of the Association, is a legal means for the enforcement of such inclusion. The Act protects the right of employees to strike in support of their demands. 29 U.S.C.A. § 163.

I further conclude that the inclusion of the language of the clause referred to relates to contracting or subcontracting of construction work to be done at the site of the construction projects of Association members within the meaning of the proviso contained in section 8(e) of the amended Act.

I determine that neither the inclusion of the language in question, nor the employment of a strike to force such inclusion is an unfair labor practice within the meaning of section 8(b) (4) (A) of the Act as amended.

Since there appears to be no basis upon which the Board may properly conclude that the charged unfair labor practice exists, the Board's petition for preliminary injunction is denied.

This opinion shall constitute my findings of fact and conclusions of law, as required by F.R.Civ.P. Rule 52(a), 28 U.S.C.

Let an order in compliance herewith be presented.