ESSEX COUNTY AND VICINITY DISTRICT COUNCIL OF CARPENTERS AND MILLWRIGHTS, UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 14436.

United States Court of Appeals Third Circuit.

Argued Nov. 8, 1963.

Decided April 30, 1964.

Robert D. Corbin, Newark, N. J. (Joseph P. Dunn, Newark, N. J., on the brief), for petitioner.

Melvin J. Welles, N.L.R.B., Washington, D. C. (Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Janet Kohn, Attorney, N.L.R.B., on the brief), for respondent.

Louis Sherman, Laurence J. Cohen, Washington, D. C. (Sherman, Dunn & Sickles, Washington, D. C., on the brief), for Building and Construction Trades Department, AFL–CIO, amicus curiæ.

Before KALODNER, STALEY and SMITH, Circuit Judges.

WILLIAM F. SMITH, Circuit Judge.

This proceeding, under Section 10, subdivisions (e) and (f) of the Labor Management Relations Act of 1947, 29 U.S. C.A. § 160(e) and (f), is before the Court on a petition for review filed by the District Council and a cross-petition for enforcement filed by the Board. The decision of the Board is reported in 141 NLRB, No. 80, 1962; 52 LRRM 1416. The narrow question raised has been considered and decided by the United States Court of Appeals for the Ninth Circuit and its decision is adverse to the position here taken by the Board. Construction, Production & Main. Lab. U. Local 383 v. N.L.R.B., 9 Cir., 323 F.2d 422 (1963); accord, Cuneo for and on Behalf of N.L.R.B. v. International Union of Operating Eng., Local 825, 216 F.Supp. 173 (D.N.J.1963); Cuneo v. Essex County & Vic. Dist. Coun. of Carpenters, etc., 207 F.Supp. 932 (D.N.J.1962); Kennedy for and on Behalf of N.L.R.B. v. Construction, Production & Main. Laborers' U., 199 F.Supp. 775 (D.Ariz.1961); Lebus for and on Behalf of N.L.R.B. v. Local 60, etc., 193 F.Supp. 392 (E.D.La. 1961). The essential facts as found by the Board are not in dispute; as we view this case, the only question we need decide is one of law, and this involves an interpretation of the statute.

The Associated Contractors of Essex County, Inc., an association of employers engaged in the construction industry, and the District Council, the authorized representative of several trade unions, were parties to a collective bargaining agreement which, by its terms, expired on May 31, 1962. The agreement contained the usual provisions relating to the adjustment and arbitration of disputes and, in addition, the following clause:

" * * * No cessation of work shall take place for any reason except for non-union condition. * * * A non-union condition shall prevail when employees are employed without a collective bargaining agreement ON ANY CONSTRUCTION WORK which is normally performed by employees working under a collective bargaining agreement with a Union affiliated with the Building Trades Department of the AFL–CIO. In such event it shall not be deemed a violation of this Agreement for employees hereunder to individually refuse to work on the job site where such non-union condition exists. To the extent legal, the Union may request employees hereunder to leave such jobs." (Emphasis supplied.)

This clause, as we construe it, covered only a "non-union condition" if maintained by an employer on the construction site.

Approximately three months prior to the termination of the existing agreement the parties entered into negotiations in

anticipation of a new contract. They exchanged written specifications of proposals which each sought to have incorporated in the new agreement. These proposals, none of which related to the above quoted clause, were discussed at several meetings held by the negotiators for the respective parties prior to and including May 31, the termination date of the existing contract. When this last meeting adjourned there were three issues remaining unresolved. The negotiators met again on June 1, at which time the representatives of the Association proposed the deletion of the "non-union condition" clause. This proposal met immediate opposition from the representatives of the District Council. The meeting thereupon ended without agreement on any of the remaining issues. A strike was called on June 4, the next working day, and on the same date the Association filed with the Board an unfair labor practice charge on the basis of which a complaint issued and was served upon the District Council.

Thereafter the negotiators, as well as other representatives of the respective parties, met in bargaining sessions on June 11 and 19, the latter session extending into the early hours of the 20th. There is some conflict in the testimony as to what issues were resolved at these meetings but it is apparent that the negotiators for each side assumed that a basis for settlement had been reached. However, as we view the instant case, the limited conflict in the testimony is of no relevance. The strike ended on the morning of June 20, and the District Council instructed its members to return to work. Thereafter the parties referred the matter to their respective attorneys.

The attorney for the District Council prepared a "short form agreement" in which the terms and conditions of the old contract, except those which had been modified by negotiation, were incorporated by reference. This agreement was forwarded to the Association, the representatives of which thereupon instructed its attorney to draft an entirely new contract. The new contract, with the "non-union condition" clause omitted, was drafted and forwarded to the District Council which rejected it. The attorney for the District Council then prepared a contract, the terms and conditions of which differed from those of the Association's draft in several respects, but particularly in its inclusion of the "non-union condition" provision. Thereafter, on Monday, July 16, the bargaining committees of the respective parties met and discussed their differences, all of which were resolved except one. The Association insisted upon the elimination of the disputed clause and the District Council insisted upon its retention.

The attorney for the District Council and two officials of the Association met on the morning of July 19, at which time further efforts were made to resolve the one remaining issue, but without success. The attorney informed the officials that unless the contract submitted by the Council was signed a strike would be called on the following Monday, July 23. The threatened strike was called, and on Monday morning the employees of nine employers, Association members, struck at thirteen construction sites. Shortly thereafter these employers capitulated and signed separate contracts which contained the "non-union condition" clause. Some of the other employers soon followed suit. It seems unnecessary to summarize in detail the events which occurred during the course of the strike.

It was found by the Trial Examiner that the District Council "threatened to strike, and then on July 23, 1962, did strike the Association's members solely for the purpose of compelling them and the Association to continue, as part of their new contract, the 'non-union condition' provision of the previous contract which had expired on June 1, 1962." This finding, which was affirmed and adopted by the Board, is supported by substantial evidence on the record considered as a whole. The Trial Examiner concluded that the conduct of the District Council constituted an unfair labor practice within the meaning of § 8(b) (4) (A) as amended by the Act of September

14, 1959. § 8(b) (4) (i) and (ii) (A), 29 U.S.C.A. § 158(b) (4) (i) and (ii) (A). We are of the opinion that this conclusion, which was likewise affirmed and adopted by the Board, was based upon an erroneous interpretation of the statute as amended.

It seems essential to the proper construction of the applicable statutory provisions that we first consider the law as it was, and as it applied to the construction industry, prior to the amendments of 1959. Section 8(b) (4) (A) of the Act of 1947, 29 U.S.C.A. § 158(b) (4) (A), declared it an unfair labor practice for a labor organization "to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, * * *. transport, or otherwise handle or work on any goods, articles, materials, * * * where an object thereof is: (A) forcing or requiring any employer * * * to cease using, selling, handling * * * the products of any other producer, processor, or manufacturer, or to cease doing business with any other person; * * *."

In June of 1951, the Supreme Court, construing the quoted provision, held that a strike, an object of which was to coerce a general contractor to terminate a subcontract held by another employer engaged in the performance of electrical work at the construction site, was an unfair labor practice within the meaning of the statute. National Labor Relations Board v. Denver Bldg. & Const. Trades Council, 341 U.S. 675, 685–692, 71 S.Ct. 943, 95 L.Ed. 1284. Approximately seven years later the Court held that a "boycott voluntarily engaged in by a secondary employer for his own business reasons," and pursuant to the terms of a hot cargo clause contained in a collective bargaining agreement, was not an unfair labor practice within the meaning of the said section. Local 1976, United Brotherhood of Carpenters, etc., v. National Labor Relations Board, 357 U.S. 93, 98–104, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958). It was further held that "a union [was]

free to approach an employer to persuade him to engage in a boycott, so long as it refrains from the specifically prohibited means of coercion through inducement of employees." Ibid, 99. However, the court went on to hold that it was an unfair labor practice for a labor union to encourage or induce a strike or a concerted work stoppage to enforce compliance with the hot cargo clause. Ibid, 105–111. It should be noted that in this case the clause provided that employees "shall not be required to handle nonunion material."

The widespread resort to the hot cargo clause as a means to circumvent the prohibitions of § 8(b) (4) (A), particularly by the Teamsters Union, led to the enactment of the amendments with which we are here concerned. See Vol. II, Leg. Hist. of the Labor-Management Reporting and Disclosure Act of 1959, 1433, 1707–1709; 2 U.S.Code Cong. and Admin.News (1959), pp. 2382–2384. The parties to this proceeding agree that these amendments effected important changes in the law but they disagree as to the nature and extent of those changes.

The relevant provision of § 8(b) (4) (A) as amended read as follows:

"(b) It shall be an unfair labor practice for a labor organization or its agents—

* * * * * *

"(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, A STRIKE OR A REFUSAL IN THE COURSE OF HIS EMPLOYMENT TO USE, MANUFACTURE, PROCESS, TRANSPORT, OR OTHERWISE HANDLE OR WORK ON ANY GOODS, articles, materials, or commodities or to perform any services; or (ii) TO THREATEN, COERCE, OR RESTRAIN ANY PERSON ENGAGED IN COMMERCE or in an industry affecting commerce,

WHERE IN EITHER CASE AN OBJECT THEREOF IS—

"(A) forcing or requiring any employer * * * to enter into ANY AGREEMENT WHICH IS PROHIBITED BY SUBSECTION (e) OF THIS SECTION;

"(B) forcing or requiring any person TO CEASE USING, SELLING, HANDLING, TRANSPORTING, OR OTHERWISE DEALING IN THE PRODUCTS of any other producer, processor, or manufacturer, or TO CEASE DOING BUSINESS WITH ANY OTHER PERSON * * *." (Emphasis supplied.)

Subsection (B) is substantially identical with that contained in (A) of the 1947 Act.

Subsection (e), added by the 1959 amendments, reads as follows:

"It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void: PROVIDED, That nothing in this subsection shall apply to AN AGREEMENT BETWEEN A LABOR ORGANIZATION AND AN EMPLOYER IN THE CONSTRUCTION INDUSTRY RELATING TO THE CONTRACTING OR SUBCONTRACTING OF WORK TO BE DONE AT THE SITE OF THE CONSTRUCTION, alteration, painting, or repair of a building, structure, or other work: * * *." (Emphasis supplied.)

The present controversy revolves around the interpretation of the quoted proviso.

■ The quoted subsection makes it an unfair labor practice for a union and an employer "to enter into any contract or agreement, * * * · whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, * * * transporting or otherwise dealing in" the products of any other producer or manufacturer. The effect of this provision of subsection (e) was to outlaw all hot cargo clauses containing the proscribed conditions, including those voluntarily agreed upon by the union and the employer. To this extent only the decision of the Court in Local 1976, United Brotherhood of etc. Carpenters v. National Labor Relations Board, supra, 98–104, was nullified. Section 8(b) (4) (A) makes it an unfair labor practice for the union to engage in, or to induce or encourage the employees to engage in, specifically proscribed conduct where an object is to force or require an employer to enter into any such contract or agreement.

■ The same subsection declares it an unfair labor practice for a union and an employer "to enter into any contract or agreement" whereby such employer agrees "to cease doing business with any other person." However, the proviso creates an exemption applicable in the construction industry but restricted in its application to agreements relating to "contracting or subcontracting * * * work" to be performed at the construction site. This limited exemption was granted apparently in recognition of problems peculiar to the construction industry, particularly those resulting from sporadic work stoppages occasioned by the traditional refusal of craft unionists to work alongside non-union men on the same project. The exemption does not extend to other agreements such as those relating to subcontracts for supplies and materials to be transported to and delivered on the construction site. These agreements are covered by the provisions discussed in the foregoing paragraph.

The Board contends that the proviso must be construed as applicable only to a voluntary agreement between the union

and an employer. With this contention as a premise, it is argued that resort to specifically proscribed activity as a means to obtain a clause, otherwise legal under subsection (e), is an unfair labor practice within the meaning of § 8(b) (4) (A). The argument has been rejected by each court which has thus far considered it. The fallacy in the argument lies in its erroneous premise. There is nothing in the language of the statute from which it may be inferred that it was the Congressional intent to restrict the exemption to voluntary contracts. The critical phrase in the proviso reads as follows: "nothing in this subsection shall apply to AN agreement." (Emphasis supplied.) If it had been the intent of Congress to limit the application of the proviso, it could have manifested this intent simply by substituting the qualifying words "a voluntary" for the indefinite article "an."

It is further argued that the Board's construction of the provisions here in question is supported by the legislative history. The specific reference is to isolated phrases and sentences quoted out of context. The pertinent legislative history as a whole, as we interpret it, gives no support to the Board's argument. Vol. I, Leg.Hist. of the Labor-Management Reporting and Disclosure Act of 1959, 943–944; Vol. II, Ibid, 1433, 1707–1709. However, since the language of the provisions is clear and unequivocal on its face, there is no reason to resort to the legislative history as an aid to construction. United States v. Oregon, 366 U.S. 643–648, 81 S.Ct. 1278, 6 L.Ed.2d 575 (1961), reh. den. 368 U.S. 870, 82 S.Ct. 24, 7 L.Ed.2d 70; National Home for Disabled Volunteer Soldiers etc., v. Wood, 299 U.S. 211, 216, 57 S.Ct. 137, 81 L.Ed. 130 (1936); St. Mary's Sewer P. Co. v. Director of U. S. Bureau of Mines, 262 F.2d 378, 382 (3rd Cir. 1959).

Section 8(b) (4) (A) as amended declares it an unfair labor practice for a union to engage in any activity therein proscribed where an object is to force or require an employer to enter into

an agreement prohibited as "unenforcible and void" by subsection (e). However, since the effect of the proviso was to preclude the application of subsection (e) to labor-management agreements relating to subcontracts for work to be performed at the construction site, coercive activity, otherwise illegal, may be employed to obtain such a contract. We should add that such an agreement is not a defense to an unfair labor practice charge made under § 8(b) (4) (B). Local 1976, United Brotherhood of etc. Carpenters v. National Labor Relations Board, Ibid, 105–111. To this extent, there has been no change in the law.

The petition for enforcement will be denied and the order of the Board will be vacated and set aside.