PACIFIC NORTHWEST CHAPTER OF the ASSOCIATED BUILDERS & CONTRACTORS, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

v.

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL NO. 701, Intervenor.

OREGON–COLUMBIA CHAPTER, the Associated General Contractors of America, Inc., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

v.

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL NO. 701, Intervenor.

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL NO. 701, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

WOELKE & ROMERO FRAMING, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

v.

CARPENTERS LOCAL NO. 944 and Carpenters Local No. 235, Intervenors.

NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

CARPENTERS LOCAL NO. 944, United Brotherhood of Carpenters & Joiners of America, AFL–CIO, and Carpenters Local No. 235, United Brotherhood of

Carpenters & Joiners of America, AFL–
CIO, Respondent.

Nos. 78–3469, 78–3487, 78–3619,
78–3468 and 79–7011.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 16, 1980.
Decided April 17, 1981.

Certiorari Granted Oct. 5, 1981.
See 102 S.Ct. 90.

Thomas M. Triplett, Portland, Or., John W. Prager, Jr., Newport Beach, Cal., Lewis K. Scott, Portland, Or., argued for petitioners; Souther, Spaulding, Kinsey, Williamson & Schwabe, Portland, Or., on brief.

Vincent J. Apruzzese, Springfield, N. J., for Chamber of Commerce, amicus curiae.

Lewis K. Scott, David H. Wilson, Jr., Dezendorf, Spears & Lubersky, Portland, Or., on brief for Oregon-Columbia Chapters et al.

Daniel R. Levinson, McGuiness & Williams, Washington, D. C., Julius Reich, Reich, Adell, Crost & Perry, Los Angeles, Cal., for Air Cond. et al., amicus curiae.

Jerome B. Buckley, Jr., Portland, Or., argued for International Union of Operating Engineers, Local 701; Carney, Probst & Cornelius, Richard R. Carney, Portland, Or., on brief.

John W. Prager, Jr., Musick, Peeler & Garrett, Newport Beach, Cal., Kenneth C. McGuiness, McGuiness & Williams, Washington, D. C., on brief for Woelke & Romero Framing, Inc.

Abe Levy, Levy, Koszdin, Goldschmid & Sroloff, Los Angeles, Cal., argued for Carpenters Local No. 944; Lawrence Rosenzweig, Los Angeles, Cal., on brief.

John G. Elligers, John H. Ferguson, Washington, D. C., Jerome B. Buckley, Jr., Carney, Probst & Cornelius, Portland, Or., Laurence J. Cohen, Sherman, Dunn, Cohen & Leifer, Sara Green, Washington, D. C., argued for N.L.R.B.; Elliott Moore, Washington, D. C., on brief.

Before BROWNING, Chief Judge, CHOY, WALLACE, SNEED, ANDERSON, SCHROEDER, FLETCHER, FARRIS, NELSON, CANBY and NORRIS, Circuit Judges.

CANBY, Circuit Judge.

These cases raise important questions concerning the scope of § 8(e) of the National Labor Relations Act, 29 U.S.C. § 158(e), which prohibits "hot cargo" agreements. The primary issue is whether the construction industry proviso to § 8(e) renders lawful clauses in collective bargaining contracts forbidding the employers to subcontract work at any construction site to a firm not having a contract with the signatory union. Additional issues are whether unions may picket or strike to induce an employer to enter these agreements and whether the agreements, once entered, may be enforced by picketing or strikes. We conclude that the subcontracting clauses fall within the construction industry proviso and consequently do not violate § 8(e). We also conclude that unions may picket or strike to obtain such agreements, but not to enforce them. The orders of the National Labor Relations Board are accordingly enforced.

## I.

*Facts.*

Two orders of the Board are under review here pursuant to 29 U.S.C. § 160(e) and (f). The first concerns a collective bargaining agreement between Oregon-Columbia Chapter of the Associated General Contractors of America, Inc. (AGC) and Local 701 of the International Union of Operating Engineers (Engineers). AGC is an association of some 200 employers engaged in construction in Oregon and southwest Washington. These employers have delegated their collective bargaining authority to AGC. AGC and Engineers entered into a collective bargaining agreement effective from June 1, 1975, through May 31, 1980, which contained the following clause:

Article VIII

Subcontractors and Other Employers.

*Section 1.* Employers shall not contract any work covered by this Agreement to be done at the site of the construction, alteration, painting or repair of a building, structure or other work to any person, firm or company who does not have an existing labor agreement with the Union covering such work.

Subsequent clauses [1] provide for a grievance procedure leading to arbitration and further provide that should the parties fail to comply with the arbitrator's decision, then "[e]ither party may take such action as they deem necessary to enforce the findings...." The effect of the latter provision is to permit either party to employ self-help, such as strikes or lockouts, that would otherwise be prohibited by another article of the agreement.

Upon complaint by Pacific Northwest Chapter of the Associated Builders & Contractors, Inc., Engineers and AGC were charged with violating § 8(e) [2] of the National Labor Relations Act, which prohibits agreements between a labor organization and an employer in which the employer agrees to refrain from using the products of another employer or to cease doing business with any other person. The case was submitted to the Board upon stipulated facts and the Board found that, while the agreement fell within the prohibition of § 8(e), it was exempted from the coverage of that provision by the construction industry proviso applicable to agreements "between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work...." The Board also ruled that the clause authorizing enforcement of the subcontracting provision by self-help was invalid. All parties petitioned for review and the Board sought enforcement of its order.

The second decision of the Board concerns Woelke & Romero Framing, Inc., (Woelke), a framing subcontractor in the construction industry in Southern California. Woelke was a party to a collective bargaining agreement entered on July 5, 1974, with the United Brotherhood of Carpenters and Joiners of America, AFL-CIO (Carpenters), a group which included Locals Number 235 and 944 involved in this litigation. That agreement expired on June 15, 1977. From about June 3, 1977, to August 4, 1977, Carpenters and Woelke engaged in collective bargaining for the purpose of negotiating a successor agreement. They broke off negotiations when they reached an impasse over several issues. [3] One such issue was the union's demand for a clause in

---

1. Other relevant clauses of the AGC agreement are:

ARTICLE IX
Settlement of Disputes
Grievance Procedure

*Section 1.* In the settlement of disputes arising out of a violation, misunderstanding or difference in interpretation of this agreement, the following procedure shall be followed:

\* \* \* \* \* \*

*Section 5.* Should the parties involved fail to comply with the [arbitrator's] findings within five (5) days after such written notification by either party ..., then all means of arbitration shall be considered exhausted. Either party may take such action as they deem necessary to enforce the findings ... and they shall not be considered in violation of any part of this Agreement.

ARTICLE X
Strikes and Lockouts

*Section 1.* Unless otherwise provided herein, it is mutually agreed that there will be no strikes or lockouts, or cessation of work by either party, for the duration of this Agreement. All disputes arising under this Agreement shall be submitted to the procedures for the settlement of disputes as provided in this Agreement....

2. Section 8(e), 29 U.S.C. § 158(e), provides in pertinent part:

It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforceable and void: *Provided,* That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting or repair of a building, structure, or other work ....

3. Another issue over which the parties reached impasse was Carpenters' demand to include Woelke's foremen in the bargaining unit. The Board found that picketing to enforce this demand violated § 8(b)(1)(B) of the Act. The union has not contested that ruling in this court. We therefore enforce the Board's order concerning this issue.

the contract that prohibited Woelke from subcontracting work at any construction jobsite "except to a person, firm or corporation, party to an appropriate, current labor agreement with the appropriate union, or subordinate body signatory to this Agreement." [4] In support of Carpenters' demand for this contract provision, Locals 235 and 944 picketed Woelke's construction sites, causing some work stoppages. The two locals were charged with violation of § 8(b)(4)(i) and (ii)(A) of the Act [5] for picketing to require an employer "to enter into any agreement which is prohibited by section 8(e)."

The case was submitted to the Board upon stipulation and the Board found that the proposed subcontracting agreement was not prohibited by § 8(e) because it fell within the construction industry proviso, and that picketing to obtain such a clause therefor did not violate § 8(b)(4). Woelke petitions for review of the Board's order, and the Board seeks enforcement.[6]

Both decisions of the Board were reviewed by a panel of this court. 609 F.2d

4. The proposed clause provides:

> The Contractor agrees that neither he nor any of his subcontractors on the jobsite will subcontract any work to be done at the site of construction, alteration, painting or repair of a building, structure or other work (including quarries, rock, sand and gravel plants, asphalt plants, ready-mix concrete plants, established on or adjacent to the jobsite to process or supply materials for the convenience of the Contractor for jobsite use) except to a person, firm or corporation, party to an appropriate, current labor agreement with the appropriate Union, or subordinate body signatory to this Agreement.

5. Sections 8(b)(4)(i) and (ii)(A) and (B), 29 U.S.C. § 158(b)(4)(i) and (ii)(A) and (B), provide:

> (b) It shall be an unfair labor practice for a labor organization or its agents—
> (4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities *or to perform any services;* or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

1341 (9th Cir. 1979). On the authority of *Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100,* 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975), the panel held that the subcontractor clauses were prohibited by § 8(e) and did not fall within the protection of the construction industry proviso because their applicability was not limited to jobsites where members of the signatory union were employed at some time during the construction project. Having found the present clauses unenforceable, the panel did not reach the questions whether picketing or striking either to obtain or enforce a lawful subcontractor clause would violate § 8(e). 609 F.2d at 1351. This court subsequently ordered rehearing before a limited en banc panel as provided by Public Law 95–486, 92 Stat. 1629, 1633 and Rule 25 of this court.

## II.

*Issues.*

Four issues are presented for determination in these cases:

> (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by subsection (e) of this section;
> (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing....

6. Along with the present cases, reported at 239 N.L.R.B. 274 (1978) (*Pacific Northwest*) and 239 N.L.R.B. 241 (*Woelke*), the Board decided *Los Angeles Building & Construction Trades Council (Donald Schriver, Inc.),* 239 N.L.R.B. 264 (1978), and *Colorado Building & Construction Trades Council,* 239 N.L.R.B. 253 (1978). The Board's order upholding broad subcontractor agreements in *Schriver* was enforced by the District of Columbia Circuit in an extensive and instructive opinion by Judge Edwards. *Donald Schriver, Inc. v. NLRB,* 635 F.2d 859 (D.C.Cir. 1980).

(1) Are the subcontracting clauses "secondary" and therefore within the scope of § 8(e)?

(2) If the clauses are within the scope of § 8(e), are they exempted from its proscription by the construction industry proviso?

(3) If the subcontracting clauses are lawful, does it nevertheless violate § 8(b)(4) for a union to picket or strike to induce an employer to agree to one?

(4) If the subcontracting clauses are lawful, does it nevertheless violate § 8(b)(4) to enforce them by picketing or strikes?

### III.

*Applicability of § 8(e).*

■ The subcontractor clauses in the present case clearly require the signatory employer to cease or refrain from using the products of another employer or to cease doing business with another person. The clauses consequently fall within the literal language of § 8(e). In *National Woodwork Manufacturers Association v. NLRB*, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967), however, the Supreme Court held that § .8(e) is not to be read as expansively as its language seems to indicate. The Court pointed out that the purpose of Congress in enacting § 8(e) was to prohibit voluntary arrangements that reached the same result as coercive secondary boycotts prohibited by § 8(b)(4)(ii)(B) of the Act. The Court therefore held that an agreement between a union and an employer which prohibited certain kinds of subcontracting was permissible so long as the objective was to preserve work traditionally performed at the jobsite by employees of the primary employer. Such a "work preservation" clause was viewed as primary and therefore did not constitute an unfair labor practice.[7] The test whether an agreement was primary and permissible was "whether

the agreement or its maintenance is addressed to the labor relations of the contracting employer vis-a-vis his own employees." *Id.* at 645, 87 S.Ct. at 1268–69. An agreement was secondary and prohibited when "the agreements and boycotts were tactically calculated to satisfy union objectives elsewhere." *Id.* at 644, 87 S.Ct. at 1268.

By the *National Woodwork* test, union signatory clauses such as those in issue here are secondary in objective. They do not seek to preserve work for the employees of the contracting employer by limiting the amount of subcontracting. Nor do they seek to protect the wage and benefit standards of those same employees in their present employment by merely limiting subcontracting to third parties who maintain equivalent standards. Instead, these union signatory clauses permit unlimited subcontracting so long as the subcontractors have an agreement with the contracting union. Such clauses are properly viewed as secondary, for they are intended to satisfy union objectives involving employees and employers outside of the bargaining or work unit. *Griffith Co. v. NLRB*, 545 F.2d 1194 (9th Cir. 1976), *cert. denied*, 434 U.S. 854, 98 S.Ct. 171, 54 L.Ed.2d 124 (1977); *NLRB v. National Maritime Union*, 486 F.2d 907 (2d Cir. 1973), *cert. denied*, 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974).

■ It is contended by Engineers that the objective of preserving work within the entire multi-employer bargaining unit of AGC is a primary goal and that this fact should take its subcontracting clause outside of the scope of § 8(e). This argument fails for two reasons. First, the clause in question does not limit subcontracting to firms that are members of AGC. Outsiders having an agreement with Engineers are eligible, even though they and their employ-

---

**7.** "Union standards" clauses, which require that an employer not subcontract with anyone whose wage and benefit scale does not meet union standards, have also been held primary. The purpose of such clauses is deemed to be protection of the pay and benefit scales of the workers of the primary employer. *Truck Driv-*

*ers Union Local No. 413 v. NLRB*, 334 F.2d 539, 548 (D.C.Cir.), *cert. denied*, 379 U.S. 916, 85 S.Ct. 264, 13 L.Ed.2d 186 (1964); *NLRB v. National Maritime Union*, 486 F.2d 907, 912 (2d Cir. 1973), *cert. denied*, 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974).

ees are wholly foreign to the multi-employer bargaining unit. The clause therefore is not a primary work preservation clause. *NLRB v. National Maritime Union*, 486 F.2d at 914. Second, § 8(e) applies in any event to an agreement which attempts to preserve work for an entire multi-employer unit rather than for single employers' employees. This court dealt with the issue in *NLRB v. Joint Council of Teamsters No. 38*, 338 F.2d 23, 28 (9th Cir. 1964):

> Respondents seem to argue that [the clause] falls within the exception to section 8(e) because it preserves the job opportunities of employees within the multi-employer bargaining unit by prohibiting subcontracting to any employer outside that unit. But if this argument were accepted, the exception to section 8(e) would permit precisely what the section itself was intended to prohibit: An agreement by an employer to boycott another unless the latter entered into a union contract.

*Accord, NLRB v. National Maritime Union, supra.*

▪ The union's further contention that work preservation for the employees of each contractor was one of the objectives underlying the union subcontracting clause, does not compel us to alter our conclusion. Regardless of the union's other objectives, if *"an object* of a clause is to aid union members generally rather than members of the unit, the object is secondary and unlawful." *National Maritime Union*, 196 N.L.R.B. 1100, 1101 (1972), *enforced*, 486 F.2d 907 (2d Cir. 1973), *cert. denied*, 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974) (emphasis supplied).

▪ It is true that the primary-secondary distinction is particularly difficult to maintain in the construction industry, where contractors and subcontractors assemble their work forces for specific short-term jobs. There is a great deal of flexibility and interchangeability of employees between bargaining units. As a result, a subcontractor clause may well serve the interests of union members in the primary bargaining unit who may later find themselves working for a subcontractor. While we believe that fact to be of great significance for purposes of determining the scope of the construction industry proviso, we do not view it as determinative of the initial applicability of § 8(e) itself. *See NLRB v. National Maritime Union*, 486 F.2d at 913–14. The primary-secondary distinction between separate employers working the same jobsite in the construction industry has been adhered to in the past, *NLRB v. Denver Building & Construction Trades*, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951), and we do not feel free to disregard it here. Moreover, the consequences of viewing union signatory clauses as primary would be not only to remove them from the scope of § 8(e) but also to remove picketing to enforce such agreements from the prohibition of § 8(b)(4)(ii)(B). For reasons stated in Section VI of this opinion, we believe that permitting coercive enforcement of union signatory clauses would be contrary to the intent of Congress.

We accordingly hold that the union signatory clauses in these cases are secondary and within the scope of § 8(e). Their validity consequently depends upon their eligibility for inclusion within the construction industry proviso to that section.

### IV.

*Scope of the Construction Industry Proviso to § 8(e).*

In order to ascertain the scope of the construction industry proviso, it is necessary to examine its legislative history in the light of the practices existing in the industry at that time and the law then applicable. In so reviewing the origins of the 1959 Landrum-Griffin Act of which § 8(e) and its proviso were a part, we recognize that our initial conclusions as to its meaning are subject to any modifications or corrections that may be compelled by a fair reading of *Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975). Indeed, it is the effect of *Connell* that provides the primary ground of controversy in

the present litigation. We believe, however, that the *Connell* decision is best analyzed after a review of the state of the industry and the legislative and administrative history of the proviso governing it.

## (A) Construction Industry Background.

The primary characteristics which differentiate the construction industry from most others are well stated in the Senate Report on the 1959 amendments:

> The occasional nature of the employment relationship makes this industry markedly different from manufacturing and other types of enterprise. An individual employee typically works for many employers and for none of them continuously. Jobs are frequently of short duration, depending upon various stages of construction.

S.Rep.No. 187, 86th Cong., 1st Sess. 27, [1959] U.S.Code Cong. & Admin. News, pp. 2318, 2344; I *Legislative History of The Labor-Management Reporting and Disclosure Act of 1959* 423 (hereinafter Leg. Hist.). These peculiarities of the construction industry created special problems for both unions and employers long before 1959. Unions had to overcome difficulties of organizing temporary workers and of maintaining wage and benefit standards in unstable employment conditions. Employers required a ready source of skilled workers available for each new job, and had to be able to forecast labor costs accurately. To satisfy these needs, unions and employers hammered out a number of mutual accommodations. One such arrangement was the closed shop, which was prevalent in the industry by the 1920's.[8] A second was negotiation of area-wide agreements covering all construction work of a certain type, with multiple contracting employers agreeing to the standards set in those agreements.[9] Of necessity, these contracts dealt with wages, hours and working conditions of employees yet to be hired for particular jobs by particular employers.[10] A third device was the agreement to restrict subcontracting in various ways—to firms maintaining union standards, or to firms that were unionized,[11] or to firms that agreed to bind themselves to contracts with the union signatory to the subcontracting clause.[12]

Some of these devices were not necessarily consistent with the organizational scheme of the National Labor Relations Act in its original form. The Act initially caused no disruption in the pattern of collective bargaining in the construction industry, however, because the National Labor Relations Board declined to exercise jurisdiction over that industry.[13] The Taft-Hartley Amendments to the Act, passed in 1947, led to a reversal of the Board's position. Those amendments prohibited striking or picketing to coerce an employer to refrain from dealing in the products of any other employer or to cease to do business

---

**8.** Haber, Industrial Relations in the Building Industry 238–40 (1930). A study by the National Manufacturers Association reported that in 1926, 69% of all construction work was done under closed shop conditions. *Id.* at 240.

**9.** Dunlop, *The Industrial Relations System in Construction*, in The Structure of Collective Bargaining 255, 256–57 (Weber ed. 1961).

**10.** S.Rep.No. 187, *supra*, 28; I Leg.Hist. 424. *See generally*, Labor-Management Reform Legislation, Hearings before the Subcommittee on Labor of the Committee of Labor and Public Welfare, United States Senate (hereinafter Senate Hearings), 86th Cong., 1st Sess. 136 (testimony of Professor Cox).

**11.** A union attempt to limit subcontracting to union firms was held exempt from the antitrust laws as early as 1934. *Levering & Garrigues Co. v. Morrin*, 71 F.2d 284 (2d Cir.), *cert. denied*, 293 U.S. 595, 55 S.Ct. 110, 79 L.Ed. 688 (1934).

**12.** Marcus, *Secondary Boycotts*, in Symposium on the Labor-Management Reporting Disclosure Act of 1959, 822, 824 (Slovenko ed. 1961) (hereinafter referred to as LMRDA Symposium).

**13.** *Brown and Root, Inc.*, 51 N.L.R.B. 820 (1943); *Johns-Manville Corp.*, 61 N.L.R.B. 1 (1945).

with any other person. § 8(b)(4)(A).[14] Subsequent to the amendments, the Board's General Counsel determined that the construction industry would be regulated by the Board.[15]

One effect of applying the amended Act to the construction industry was the invalidation of collective bargaining agreements entered before any employees were hired on the job. *Guy F. Atkinson Co. and J. A. Jones Construction Co.*, 90 N.L.R.B. 143 (1950), *enforcement denied on other grounds*, 195 F.2d 141 (9th Cir. 1952). The amended Act was also applied to prohibit a construction union from picketing a jobsite in order to force the general contractor with whom it had a collective bargaining agreement to cease doing business with a particular subcontractor on the job whose employees were non-union. *NLRB v. Denver Building & Construction Trades Council*, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951). The picketing was found to violate § 8(b)(4)(A)'s prohibition of coercive secondary boycotts.

These applications of the amended National Labor Relations Act to the construction industry were sufficiently disruptive of existing practices that there was agitation for modification of the Act, particularly in regard to prehire practices and secondary activity. In 1954, President Eisenhower called for amendments to permit prehire agreements and to shorten to 7 days the time by which a nonunion worker could be required to join a union under a union-shop agreement. 100 Cong.Rec. 111, [1954] U.S.

Code Cong. & Admin. News 1531, 1532. Again in 1959, when calling for amendments to tighten the prohibition against secondary boycotts, the President added that provisions were needed "to make clear that secondary activity is permitted ... under certain circumstances, against secondary employers engaged in work at a common construction site with the primary employer." S.Doc. 10, 86th Cong., 1st Sess.; 105 Cong.Rec. 1297; I Leg.Hist. 82.

Accommodation to the special conditions of the construction industry was consequently an important consideration that found expression in the 1959 amendments to the Act. Those amendments, however, also embodied another major goal of Congress at the time—that of limiting "hot cargo" agreements.

In June 1958, the Supreme Court had decided *Local 1976, United Brotherhood of Carpenters v. NLRB, (Sand Door)*, 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186, *Sand Door* stated that a union did not violate § 8(b)(4)(A) by securing the voluntary participation of an employer in a boycott of another employer's product. Although the Court said it found no occasion to determine the legality of "hot cargo" clauses (by which an employer agreed to boycott nonunion firms) as such, *id.* at 107, 78 S.Ct. at 1020, *Sand Door* was widely interpreted as permitting them. The decision was seen as creating a loophole in the Act, and it contributed heavily to the move toward amending the secondary boycott provision of the Act.

---

**14.** The relevant portions of § 8(b)(4)(A) are now in § 8(b)(4)(ii)(B), quoted in note 4 *supra.*

**15.** Denham, *Taft Act's Impact on the Construction Industry, reprinted in* 21 L.R.R.M. 44 (1948). The Board's decision to exercise jurisdiction over the industry following passage of the Taft-Hartley Amendments resulted, in part, from the Amendments' prohibiting the closed shop and "back up crews" (featherbedding), two accepted practices in the construction industry. Despite the General Counsel's action, the Taft-Hartley Act was virtually ignored within the construction industry until the Board decided *United Ass'n of Journeymen & Apprentices of Plumbing and Pipefitting Indus-*

*try (Brown-Olds)*, 115 N.L.R.B. 594 (1956), and *Mountain Pacific Chapter of Associated General Contractors Inc. (Mountain-Pacific)*, 119 N.L.R.B. 883 (1958), *remanded on other grounds*, 270 F.2d 425 (9th Cir. 1959). Apruzzese, *The LMRDA and the Building and Construction Industry*, LMRDA Symposium, note 12, *supra*, 1019, 1029. Thereafter the General Counsel granted a moratorium to the construction industry to allow it to bring its hiring hall practices into line with the provisions of the Taft-Hartley Act. *See* Fenton, *Union Hiring Halls: NLRB Rules, Penalties*, 42 L.R.R.M. 101, 103 (1958).

(B) *The Landrum-Griffin Amendments and § 8(e).*

The 1959 revisions of the Act accomplished the congressional purposes in various ways. The clearest accommodation to the peculiar conditions of the construction industry was found in § 8(f),[16] which authorized unions and employers in that industry to enter prehire agreements fixing terms and conditions of employment of workers yet to be hired. This provision amounts to an exception to §§ 8(a)(1), (2) and 8(b)(1)(A), which make it an unfair labor practice for both the employer and the union to enter a collective bargaining agreement before the union, represents a majority of employees in the unit. *International Ladies Garment Workers Union v. NLRB*, 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961); *see NLRB v. International Association of Bridge, Structural & Ornamental Iron Workers*, 434 U.S. 335, 344–45, 98 S.Ct.

651, 657–58, 54 L.Ed.2d 586 (1978). Section 8(f) also shortened to 7 days the period for nonunion workers to join the union under a union-shop agreement.

Conflicting policies were reflected clearly in the passage of § 8(e), which was intended to narrow or close the loophole for "hot cargo" agreements created by the *Sand Door* decision. The Senate bill prohibited such agreements only in the trucking industry,[17] while the House bill outlawed them everywhere.[18] The Conference Committee adopted the House version, but added the provisos creating exceptions for the garment and construction industries.[19] The garment industry exception was unlimited as to time and place,[20] while the construction industry proviso excepted agreements "relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting or repair of a building, structure or other work. . . ."

**16.** Section 8(f), 29 U.S.C. § 158(f), provides:
It shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members (not established, maintained, or assisted by any action defined in subsection (a) of this section as an unfair labor practice) because (1) the majority status of such labor organization has not been established under the provisions of section 159 of this title prior to the making of such agreement, or (2) such agreement requires as a condition of employment, membership in such labor organization after the seventh day following the beginning of such employment or the effective date of the agreement, whichever is later, or (3) such agreement requires the employer to notify such labor organization of opportunities for employment with such employer, or gives such labor organization an opportunity to refer qualified applicants for such employment, or (4) such agreement specifies minimum training or experience qualifications for employment or provides for priority in opportunities for employment based upon length of service with such employer, in the industry or in the particular geographical area: *Provided*, That nothing in this subsection shall set aside the final proviso to subsection (a)(3)

of this section: *Provided further*, That any agreement which would be invalid, but for clause (1) of this subsection, shall not be a bar to a petition filed pursuant to section 159(c) or 159(e) of this title.

**17.** S. 1555, I Leg.Hist. 582.

**18.** H.R. 8342 as amended by H.R. 8400, I Leg. Hist. 683.

**19.** H.R.Rep.No. 1147 (Conference Report) 86th Cong., 1st Sess. 38–40, [1959] U.S.Code Cong. & Admin. News, p. 2511; I Leg.Hist. 942–44 (1959).

**20.** The garment industry proviso to § 8(e), 29 U.S.C. § 158(e), states:
*Provided further*, That for the purpose of this subsection and subsection (b)(4)(B) of this section the terms "any employer", "any person engaged in commerce or an industry affecting commerce", and "any person" when used in relation to the terms "any other producer, processor, or manufacturer", "any other employer", or "any other person" shall not include persons in the relation of a jobber, manufacturer, contractor, or subcontractor working on the goods or premises of the jobber or manufacturer or performing parts of an integrated process of production in the apparel and clothing industry. . . .

■ It is the nature and meaning of the construction industry proviso's restriction to the jobsite that gives rise to the present controversy. The contractors assert that the proviso is intended to authorize subcontracting clauses in collective bargaining agreements only when union workers are present at the jobsite, so that the presence of nonunion workers there might lead to friction. The unions claim that the intent was to authorize subcontracting clauses whether or not union workers were at the jobsite, so long as the clauses refer to work to be performed at the construction site. Although the matter is not free from doubt, we believe that the legislative history favors the latter view.

**(C) *Legislative Discussion of the Construction Industry Proviso.***

The legislative history regarding the construction industry proviso is much less exhaustive than that surrounding the garment industry proviso,[21] but there are nevertheless indications of congressional intent in the records. Senator Kennedy, the chairman of the Conference Committee, said of the two provisos, that "[b]oth changes were necessary to avoid serious damage to the pattern of collective bargaining in these industries." 105 Cong.Rec. 17899; II Leg.Hist. 1432. Unlike the garment industry, the construction industry was not exempted from the provisions of § 8(b)(4) that prohibited striking or picketing to coerce a secondary boycott; it was merely exempted from § 8(e)'s prohibition of agreements between a union and an employer by which the employer would boycott others. The Conference Committee stated its intent in regard to the proviso as follows:

> The committee of conference does not intend that this proviso should be construed so as to change the present state

of the law with respect to the validity of this specific type of agreement relating to work to be done at the site of the construction project or to remove the limitations which the present law imposes with respect to such agreements.... To the extent that such agreements are legal today under section 8(b)(4) ..., the proviso would prevent such legality from being affected by section 8(e).

H.R.Rep.No. 1147, 86th Cong., 1st Sess. 39, [1959] U.S.Code Cong. & Admin. News, p. 2511; I Leg.Hist. 943. Senator Kennedy analyzed the proposed § 8(e) as follows:

> The first proviso under new § 8(e) of the National Labor Relations Act is intended to preserve the present state of the law with respect to picketing at the site of a construction project and with respect to the validity of agreements relating to the contracting of work to be done at the site of a construction project.
>
> . . . . .
>
> *Agreements by which a contractor in the construction industry promises not to subcontract work on a construction site to a nonunion contractor appear to be legal today. They will not be unlawful under § 8(e)....*
>
> . . . . .
>
> It should be particularly noted that the proviso relates only to the "contracting or subcontracting of work to be done at the site of the construction." The proviso does not cover boycotts of goods manufactured in an industrial plant for installation at the jobsite, or suppliers who do not work at the jobsite.

105 Cong.Rec. 17900; II Leg.Hist. 1433 (emphasis supplied).

As Senator Kennedy made clear, unions continued to be forbidden to picket or strike at a construction site for secondary objec-

---

**21.** There is a substantial explanation in the legislative history of the highly integrated subcontracting arrangements in the garment industry and the problem of "sweatshop" conditions. *See, e. g.*, 105 Cong.Rec. 17381, II Leg. Hist. 1385 (Senators Javits and Goldwater); 105 Cong.Rec. 15538, II Leg.Hist. 1576 (Memorandum of Reps. Thompson and Udall); 105 Cong.Rec. 15848; II Leg.Hist. 1680 (Rep. Teller).

tives, which meant that the holding of *Denver Building Trades, supra,* was left in effect. On the other hand, the Conference Report and Senator Kennedy made it equally clear that unions and employers could enter subcontracting agreements as permitted by law prior to the enactment of the new § 8(e).

It seems more likely than not that the "present law" referred to by the Conference Committee did not restrict the agreements that Senator Kennedy said "appear to be legal" to jobsites where union workers were present. The *Sand Door* decision, *supra,* which supplied much of the impetus for § 8(e), had legitimized secondary boycotts the objectives of which clearly went beyond the mere avoidance of shoulder-to-shoulder friction between workers. It is true that the construction industry proviso narrowed the geographical scope of the *Sand Door* rule by introducing the jobsite limitation, but we do not interpret the words of the proviso as indicating an intent to narrow the substantive scope of the *Sand Door* rule on the jobsite.

It should be noted that shortly before enactment of the proviso, the District of Columbia Circuit had upheld a subcontractor agreement the terms of which were as broad as those presently in issue. *Operating Engineers Local Union No. 3 v. NLRB,* 266 F.2d 905 (D.C.Cir.), *cert. denied sub nom. St. Maurice v. NLRB,* 361 U.S. 834, 80 S.Ct. 86, 4 L.Ed.2d 76 (1959).[22] While that case dealt with an interunion dispute, the terms of the secondary agreement were not restricted to that or any other situation of jobsite conflict. In upholding the agreement, the Court referred to the Board's reasoning "that the preclusion of future work to a prospective subcontractor in the circumstances did not justify the Board in holding that the rights of unidentified employees of such prospective employer were adversely affected." 266 F.2d at 908.

Moreover, a survey of major labor contracts in existence in 1959 revealed that more than 50 of them contained clauses restricting subcontracting to firms complying with the terms of the prime employer's agreement. Lunden, *Subcontracting Clauses in Major Contracts,* 84 Monthly Labor Review 579 (Part I), 715 (Part II) at 715 (1961). While the survey does not adequately differentiate between union signatory clauses and union standards clauses, it is nevertheless clear that numbers of broad subcontractor agreements were in existence.[23] The survey canvasses various limi-

---

**22.** The *Engineers* decision was submitted to the House committee investigating labor practices as part of the testimony of Paul H. Robbins, Executive Director of the National Society of Professional Engineers. 2 Hearings Before a Joint Subcommittee of the Committee on Education and Labor, House of Representatives, 86th Cong., 1st Sess. on H. R. 3540, H. R. 3302, H. R. 4473 and H. R. 4474 and Related Bills Regarding Labor-Management Reform Legislation, 803–07 (1959) (hereafter House Hearings).

In addition, Edward M. Carlton, office manager of St. Maurice, Helkamp and Musser, the subcontractor involved in *Engineers,* appeared before the Committee and testified as to the scope of the subcontracting clause:

The contract also contains a clause which is referred to in the industry as the subcontractor clauses. In effect, that clauses (sic) says that ány time an AGC contractor subcontracts work the subcontractor must agree to apply the terms and conditions of the AGC Operating Engineers' agreement *to his employees.* This, of course, means that the sub-

contractor's employees must become members of Operating Engineers local 3.

Since about 1955, the AGC and the Operating Engineers *have enlarged the subcontractor clauses so that an AGC contractor will not subcontract any work unless the subcontractor agrees in advance to be bound by the AGC Operating Engineers' agreement.*

5 House Hearings 2366 (Emphasis supplied). Although the *Engineers* decision was not *directly referred to in the Senate Hearings, the* problem of union signatory clauses was brought to the committee's attention. Senate Hearings 752 (Testimony of Sen. Curtis).

**23.** Office of the General Counsel, Memorandum 76–57, December 15, 1976, *reprinted in* Labor Relations Yearbook 1976, p. 295. Because Lunden failed adequately to distinguish between union signatory and union standards clauses, the General Counsel found that study "inconclusive." *Id.* at 308. The General Counsel's own study concluded that there was no "pattern" of collective bargaining in the industry, but that the existing clauses constituted

tations appearing in subcontracting clauses in the construction industry, but makes no mention of any restrictions to the jobsite or references to the problem of friction between union and nonunion workers there. *Id.* at 715–16. That there may not have been a consistent pattern of subcontractor agreements of the type in issue here is not crucial. What does emerge from the contemporaneous scene is that some such agreements existed and were legal and that Congress did not appear to intend a change in that condition.

## V.

### (A) *The Connell Decision.*

It was against this industrial and legislative background that the Supreme Court decided *Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100,* 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975). *Connell* was an antitrust suit brought by a general contractor against a union that was picketing in order to coerce the contractor to enter an agreement to deal only with subcontractors having a collective bargaining agreement with the union. The union expressly disclaimed any interest in representing the general contractor's employees. The picketing was successful and the contractor sought to annul the ensuing agreement on the grounds that it violated the antitrust laws.[24] One of the defenses raised by the union was that

the agreement could not be a violation of the antitrust laws because it was authorized by the proviso to § 8(e) of the National Labor Relations Act. The Supreme Court rejected that defense and held that broad subcontracting agreements applicable to every jobsite where the general contractor might hire subcontractors were invalid when entered outside of the context of a collective bargaining relationship between the union and the general contractor.

The employers who attack the subcontracting clauses in the present case argue that *Connell's* language necessarily requires a conclusion that subcontracting clauses are permissible only when they serve the purpose of avoiding jobsite friction between union and nonunion workers employed at the same jobsite. So interpreted, *Connell* would invalidate the agreements in issue here at least until the presence of union workers at a particular jobsite triggered their application. We concede at the outset that the *Connell* opinion contains considerable emphasis on problems of shoulder-to-shoulder friction between union and nonunion workers at the jobsite, and additional emphasis on antagonism of the 1959 Congress to "top-down" organizing that is one of the effects of subcontractor agreements. Nevertheless, we believe that this reading of the *Connell* decision misconstrues the Supreme Court's view of § 8(e) and gives too narrow a scope to the construction industry proviso. We think that the prevail-

only a "mosaic." Union signatory clauses, not restricted to a particular jobsite, were part of that mosaic. *Id.* at 309.

**24.** *Connell* was another chapter in the dispute in Dallas between building contractors and trade unions. In *Dallas Building & Construction Trades Council v. NLRB,* 396 F.2d 677 (D.C.Cir.1968), a clause similar to the one in *Connell* was at issue. Unlike Connell, however, the general contractor that was picketed had nonunion employees. Although the Trades Council expressly disavowed any interest in organizing the general contractor's workers, both the Board and the District of Columbia Circuit Court of Appeals concluded otherwise. The court held that because there was an organizational objective the picketing was limited

to thirty days by § 8(b)(7), a period which the unions had exceeded.

The court's opinion left open the possibility of picketing more than thirty days if the unions could conclusively show no organizational objective. In order to avoid the § 8(b)(7) problem, the unions picketed contractors who had no employees of their own. The contractors sought to challenge this practice before the Board, but the General Counsel refused to issue a complaint. *See Connell,* 483 F.2d 1154, 1158 (5th Cir. 1973), and 421 U.S. at 631–32 n. 10, 95 S.Ct. at 1839 n. 10.

When Local 100 began picketing Connell, the contractor did not file a complaint with the Board, but immediately sued the union for violating both federal and state antitrust laws.

ing thrust of *Connell* is to the contrary and favors a broader view of the exemption. Our conclusion is supported in particular by the *Connell* opinion's emphasis on the absence of a collective bargaining relationship, its references to legislative history and its characterization of the interests served by the proviso.[25] Our view is reinforced by the adverse practical consequences that would follow from the narrower reading of the proviso. Each of these factors bears elaboration.

The first and most obvious distinction of *Connell* from the present cases is that the agreements in *Connell* arose outside of the context of a collective bargaining relationship. This fact was of course crucial for antitrust purposes, because the national policy of encouraging collective bargaining has served as the basis for a judicially created labor exemption from the antitrust laws.[26] The absence of such an interest was pointedly referred to in *Connell*:

In this case, Local 100 had an interest in representing Connell's employees. The

federal policy favoring collective bargaining therefore can offer no shelter for the union's coercive action against Connell or its campaign to exclude nonunion firms from the subcontracting market.

421 U.S. at 626, 95 S.Ct. at 1837.[27] The focus of the *Connell* decision was therefore understandably upon the situation created by subcontracting clauses in the absence of a collective bargaining agreement with the prime contracting employer.

That focus on the part of the Court was not merely the product of the antitrust setting of *Connell*, however. The parties themselves had framed the issues toward the same end. The union contended that all subcontractor agreements were validated by the plain words of § 8(e). The employer responded by urging that "despite the unqualified language of the proviso, Congress intended only to allow subcontracting agreements within the context of a collective-bargaining relationship ...," but not those involving a "stranger" contractor. *Id.* at 627, 95 S.Ct. at 1837.[28] The subject of

**25.** But for the *Connell* decision, we would have no difficulty in enforcing the Board's order. Prior to *Connell*, this court, other circuits and the Board had upheld broad subcontracting clauses in collective bargaining agreements. *See, e. g., Construction, Production & Maintenance Laborers Union, Local 383 v. NLRB*, 323 F.2d 422 (9th Cir. 1963); *Suburban Title Center Inc., v. Rockford Building & Construction Trades Council*, 354 F.2d 1, 2–3 (7th Cir. 1965), *cert. denied*, 384 U.S. 960, 86 S.Ct. 1585, 16 L.Ed.2d 673 (1966); *United Association of Journeymen & Apprentices of the Plumbing and Pipefitting Industry Local 48*, 190 N.L.R.B. 415, 416–17 (1971).

**26.** *See Connell*, 421 U.S. at 622–23, 95 S.Ct. at 1835; St. Antoine, *Connell: Antitrust Law at the Expense of Labor Law*, 62 Va.L.Rev. 603 (1976). Labor unions also have a statutory exemption from the antitrust laws by virtue of sections 6 and 20 of the Clayton Act, 15 U.S.C. § 17, 29 U.S.C. § 52, and sections 4, 5 and 13 of the Norris-LaGuardia Act, 29 U.S.C. §§ 104, 105, 113. These statutes declare that labor unions are not combinations in restraint of trade and exempt specific union activities including secondary boycotts from the antitrust laws and from certain kinds of injunctive relief. These statutes do not, however, exempt concerted activity or agreements between unions

and non-labor parties. *Connell, supra*, 622–23, 95 S.Ct. at 1835. *See generally*, R. Gorman, Basic Text on Labor Law, 621–31 (1976).

**27.** The fact that *Connell* was an antitrust case outside of the context of collective bargaining led to a natural emphasis by the Court on the pursuit of market efficiency through competition. This emphasis reappears in Judge Sneed's dissent, *infra* 654 F.2d 1325–1326, but we find it far less compelling in this labor case in which no antitrust issues have been raised. The thrust of the labor laws, of course, is frequently contrary to that of the antitrust laws. *See* St. Antoine, *supra*, n. 26.

**28.** The briefs in *Connell* concentrated entirely on the distinction between the presence and absence of a collective bargaining relationship in determining the validity of subcontracting clauses. The policy of preventing jobsite friction was raised tangentially in the appendix to Local 100's brief which included a memorandum by the NLRB General Counsel explaining why he would not issue a complaint in a case factually similar to *Connell*. Significantly, that memorandum, dealing with Hagler Construction Co., was distinguished in the *Connell* opinion as being "... addressed to a different argument that a subcontracting clause should be allowed only if there is a *pre-existing* collective

controversy, then, was the validity of subcontractor agreements *outside* of the collective bargaining context, and the *Connell* opinion must to a large degree be read in that light. The Court's conclusion, reached after a discussion of the legislative history and policies behind § 8(e), was clearly limited to the situation before it:

> We therefore hold that this agreement, which is outside the context of a collective bargaining relationship and not restricted to a particular jobsite, ... may be the basis of a federal anti-trust suit. ...

Id. at 635, 95 S.Ct. at 1841. The holding of *Connell*, then, does not in the strict sense control the cases before us.

The *Connell* opinion did, however, discuss at length the reach of § 8(e) and its construction industry proviso, upon which the present cases turn. It therefore becomes necessary to interpret the language of *Connell* and apply it to the situation of the cases at bar where a collective bargaining relationship existed between the unions and the contractors with whom the agreements were sought.[29] A major question is whether the presence or absence of a collective bargaining relationship, obviously significant in the antitrust context of *Connell*, remains pivotal when the issue is purely one of labor law.

We believe that there is a complex of factors affecting labor relations in the construction industry that renders the collective bargaining relationship crucial in the present cases and we find the underlying policies reflected in parts of the *Connell* opinion itself. We also believe that these factors exist at the construction jobsite but are by no means limited to the problem of shoulder-to-shoulder friction between union and nonunion workers there. These two themes—the nature of the collective bargaining relationship in the construction industry and the manner in which these characteristics are exhibited at the jobsite—are interwoven in *Connell* as they are in the present controversy. We will attempt, however, to discuss them separately even though each will necessarily intrude upon the other.

The legislative history already discussed should make it clear that the outstanding peculiarity of the construction industry is that the work force of any given employer—contractor or subcontractor—is highly flexible and grows or diminishes or even disappears depending on the temporary contracting or subcontracting arrangements at any particular jobsite. As Congress recognized in passing § 8(f), collective bargaining cannot even await the presence of workers on the job. Moreover, when there are workers already employed by a general contractor, the interests of those employees are not permanently or inevitably bound to that single employer. The employer has an option on any given project to use some of his own workers, to subcontract to an employer who will use those same workers, or to subcontract to one who will use others represented by the same union, a different union, or no union. Under those conditions the employees and their unions are faced with severe problems not only of maintaining wage levels, but of protecting benefits such as retirement pensions and paid vacations that depend upon continuity of employer contributions.

bargaining relationship with the general contractor or if the general contractor has employees who perform the kind of work covered by the agreement." 421 U.S. at 632 n. 10, 95 S.Ct. at 1839 n. 10. (Emphasis in original).

**29.** In *Woelke*, the union had entered a three-year collective bargaining agreement with the employer and the dispute arose during negotiations to renew the contract. In *Pacific Northwest*, the union had long had a continuous collective bargaining agreement with the Association of General Contractors. We therefore need not reach and express no opinion on the question whether a "prehire" agreement entered or sought pursuant to § 8(f) of the Act is a sufficient "collective bargaining relationship" to render permissible the entry of subcontracting agreements. We note that prehire agreements were held sufficient to legitimize subcontracting agreements in *Donald Schriver Inc. v. NLRB*, 635 F.2d 859 (D.C.Cir.1980).

When a union representing a contractor's employees seeks to restrict subcontracting to firms having a collective bargaining agreement with the union, the union in fact pursues a number of objectives some of which might fairly be characterized as primary and others as secondary. The welfare of the employees in the primary bargaining unit is clearly likely to be affected by an employer's choice to hire a subcontractor who may himself employ those same employees. On the other hand, the union clearly has secondary goals that may include organizing the employees of a subcontractor who have no connection with the primary bargaining unit.

■ It is quite true that when a union seeks to serve the interests of employees in its bargaining unit not as employees of their existing employer, but as potential employees of some other employer, the arrangement is legally viewed as secondary. *National Woodwork,* 386 U.S. at 644–45, 87 S.Ct. at 1268; *National Maritime Union, supra.* We do not quarrel with this well-established rule, nor with the rule that when primary and secondary objectives are combined, an agreement is regarded as secondary for purposes of the National Labor Relations Act. ·*NLRB v. Denver Building & Construction Trades Council,* 341 U.S. at 689, 71 S.Ct. at 952, 95 L.Ed. 1284 (1951).

We do, however, find sufficient support in the legislative history of the 1959 Amendments to suggest that Congress was sensitive to both the primary and secondary considerations involved in subcontractor arrangements and wished not to interfere with these mixed union objectives when they could be achieved by agreement with the prime employer. Even though a con-struction union's interest in subcontracting at the jobsite is secondary so as to bring it within § 8(e), it is far more direct and involves the union's members in the primary bargaining unit far more than is the case when unions outside of the construction industry pursue secondary objectives.

The importance of this fact is that it renders the existence of a collective bargaining relationship highly significant. When a union represents employees of a prime contractor and seeks a subcontracting agreement, it has the interests of the employees in its primary bargaining unit at stake to at least some degree. In the *Connell* situation, the union is utterly without any objective that could be characterized as primary or direct. Because the union in *Connell* disclaimed any interest in representing the employees of Connell, all of its goals were necessarily secondary and could not be connected to any primary representational interest.

The significance of the restriction of the § 8(e) proviso to work performed at a jobsite may now become more clear. It is at the jobsite that all of the special characteristics of the construction industry are manifested. It is true that *one* of these characteristics is that union workers are traditionally hostile to the presence of nonunion workers on the same job at the same time. But that is clearly not the only or even the major characteristic exhibited. It is at the jobsite where the general contractor can exercise the flexibility to use its own workers or those of a subcontractor, where the flexibility of subcontracting arrangements may lead to multiple employers hiring a few workers for short periods of time,[30] and where working conditions applicable to one

---

**30.** The 1977 Census of Construction Industries found that there were more than 288,000 "specialty trade contractors" (a category which includes fifteen different subcontracting functions). On the average, each firm employed six construction workers. U. S. Bureau of Census, Census of Construction Industries (1977), *cited in* Statistical Abstract of the United States (1979) Table 1365, p. 776.

One commentator has aptly summarized the peculiar problems confronted by labor unions attempting to organize construction workers as well as the techniques which they have employed:

Union insistence on having the contractor use only union men runs counter to the general theory of free determination on which the Wagner Act was based. Elections on the part of the employees are impractical, how-

**1318**

set of workers may very well affect others working on the same project.[31]

We believe that the *Connell* opinion is sensitive both to the interconnection of interests between employees of the various contractors and subcontractors and to the broad manner in which any or all of these factors may be exhibited at the jobsite. In dealing with the legislative history of the construction industry proviso, the opinion in *Connell* points out that the proviso was "explained only by bare reference to 'the pattern of collective bargaining' in the industry." 421 U.S. at 628–29, 95 S.Ct. at 1838. The legislative history discussed above indicates, we believe, that the pattern of collective bargaining included broad subcontracting agreements. To the extent that the just-quoted comment in *Connell* dismisses the history regarding the pattern of collective bargaining, it may well be explained by the fact that *Connell* was dealing with a case not considered by Congress, in which there was no collective bargaining relationship.[32]

In any event, the subsequent language of the *Connell* opinion appears quite clearly to encompass the multiple considerations affecting the construction industry at the jobsite. The opinion suggests that the con-

struction industry proviso may have been adopted "as a partial substitute for an attempt to overrule" *Denver Building Trades*, 421 U.S. at 629, 95 S.Ct. at 1838. *Denver Building Trades* had outlawed the picketing of a contractor at a jobsite in order to force it to cease doing business with a nonunion subcontractor working there. The *Connell* opinion refers to congressional discussion of special problems in the construction industry related both to the § 8(e) proviso and to the attempt to overrule *Denver Building Trades*. That discussion, according to the Court, "focused on the problems of picketing a single nonunion subcontractor on a multiemployer building project, and the close relationship between contractors and subcontractors at the jobsite." *Id.* 421 U.S. at 629–30, 95 S.Ct. at 1838. The Court's footnote to this statement refers to legislative history that clearly goes beyond the problem of shoulder-to-shoulder conflict between union and nonunion workers at the jobsite. The first excerpt referred to is by Senator Morse whose statement includes the following:

> The secondary boycott ban is based upon the concept of two employers—a primary and a secondary employer. The theory is that a neutral employer should not be

> ever, in an industry where the employment may be over before an election can be held, and where the employees on the next job may be a substantially different group. It would be literally impossible to maintain a union if the men had to be organized anew each time they went to a new job. The industrial union can afford the luxury of indifference as to whom the employer hires because the important thing is to organize the employees once they are on the job. The building trade union cannot operate efficiently unless it can require the employer to hire its members in the first place.

> . . . . .

> [B]uilding trade unions [therefore] have not organized employees by techniques familiar to manufacturing. Instead, the construction unions have, in effect, organized the employers. An agreement with the employer that he will hire only union members is much the most effective way to standardize working conditions in an industry where jobs are so fluid.

Fleming, *The Building Trades and Title VII of LMRDA,* in LMRDA Symposium, *supra,* note 12, at 1034, 1043.

**31.** *See Donald Schriver Inc., supra,* 635 F.2d at 883–884.

**32.** In *Connell,* the Fifth Circuit requested that the parties and their amici submit supplemental briefs concerning the pattern of bargaining practices at the time of the 1959 amendments. The union was unable to provide any information which would allow the conclusion that stranger clauses were part of the pattern and that Congress therefore intended to preserve this practice. 483 F.2d at 1182 (dissenting opinion). Such is not the case with regard to particular union clauses. The decision of the District of Columbia Circuit in *Operating Engineers, supra,* as well as the House and Senate Hearings, *supra,* note 24, suggest that Congress was well aware of the existence of these clauses.

compelled to suffer because of a labor dispute the union has with somebody else, but the theory breaks down when the two employers are "allies." Senator Taft said that the secondary boycott section "is not intended to apply to a case where the third party is, in effect, in cahoots with, or acting as a part of, the primary employer." [33] The National Labor Relations Board and the courts have failed to keep Senator Taft's concept in mind. The Board has considered subsidiaries to be separate employers. Other enterprises, substantially controlled by the same persons, have been considered separate employers, even though one manufactured a product incorporated into the finished article produced by the other.

The case of the building and construction industry represented probably the most flagrant injustice, where a general contractor is, in effect, entirely in control of the kind of labor relations taking place on a site which he runs. He lets subcontracts based upon price, responsibility, and the ability to handle labor relations. He lets those contracts, very well knowing the kind of labor relations which may exist within any of the subcontractor companies. He is not acting in the dark, Mr. President. He is not innocent of any unfair labor policies on the part of a subcontractor.

105 Cong.Rec. 17880–81; II Leg.Hist. 1425. Even where the sources cited by *Connell* deal with union workers at the jobsite, they reflect a number of interests of the union that affect members of its own bargaining unit as well as the members in secondary employ. The memorandum by representatives Thompson and Udall is illustrative:

> Where all the men are employed on the same project, the division into different trades or crafts, each with its own em-

ployer, must not be allowed to obscure their common interests—they work side by side and the wages and working conditions of one trade affect all the others. This situation is utterly unlike the situation in true secondary boycotts, as where carpenters in Los Angeles refuse to work on nonunion doors made in Minnesota by men whose wages could not affect the wages of carpenters in Los Angeles. The illegality of such a boycott would not be affected by the amendment.

> . . . [A] reason for outlawing secondary boycotts is that they drag neutral employers into disputes in which they have no interest. Where all the employers affected are bound together in the common work of putting up a single building, none is truly neutral. The undertaking is so integral that each is affected by and can influence the conduct of the others.

105 Cong.Rec. 15541; II Leg.Hist. 1577. These materials cited by the *Connell* Court suggest a number of reasons why Congress may have wanted to restrict the construction industry's use of subcontracting agreements to work done on a jobsite. These sources do not limit themselves to and, indeed, place very little emphasis on, the problem of shoulder-to-shoulder friction between union and nonunion workers actually present at the jobsite.

The *Connell* opinion quotes *National Woodwork Manufacturers, supra,* to the effect that the construction industry proviso is "designed to allow agreements pertaining to certain secondary activities on the construction site because of the close community of interests there, but to ban secondary-objective agreements concerning nonjobsite work, in which respect the construction industry is no different from any other." 421 U.S. at 630, 95 S.Ct. at 1839, quoting 386 U.S. at 638–39, 87 S.Ct. at 1265. It is clear that the *Connell* opinion views the jobsite

---

**33.** Senator Taft's remarks were part of a colloquy with Senator Ives on June 30, 1949, 95 Cong.Record 8709. Senator Taft was referring to the garment industry, but he cited for his proposition a case that involved the construc-

tion industry: *Douds v. Metropolitan Federation of Architects, Engineers, Chemists & Technicians, Local 231, (Project Engineering Co.),* 75 F.Supp. 672 (S.D.N.Y.1948).

considerations of *National Woodwork* as going well beyond the problem of friction among workers,[34] because *Connell* next refers to some courts that have suggested that the proviso serves an "even narrower function"—the alleviation of "the frictions that may arise when union men work continuously alongside nonunion men on the same construction site." *Id.* quoting *Drivers Local Union No. 695 v. NLRB,* 361 F.2d 547, 553 (D.C.Cir.1966). The *Connell* opinion does not adopt this "even narrower" reading of the proviso, and indeed finds it unnecessary to treat the matter further because in the *Connell* case the union did not purport to represent *any* of the interests served by the proviso. 421 U.S. at 631, 95 S.Ct. at 1839.[35]

▊ We believe that it would do some violence to the language of the *Connell* opinion to adopt the "even narrower" view of the construction industry proviso which the Court in *Connell* did not represent to be its own. Yet this consequence would follow from restricting the applicability of subcontractor agreements to those instances where shoulder-to-shoulder jobsite friction can occur. Instead, we think that it is more in accord with the language of *Connell* to permit those agreements to apply to any jobsite at which an employer with a collective bargaining relationship with the union is a contractor.

We concede that the language of the *Connell* opinion dealing with congressional antagonism to "top-down organizing" may well lean in a direction contrary to our views. We think it is countered by *Connell's* recognition of other vital concerns of collective bargaining in the construction industry reflected in the community of interest at the jobsite. There is some "top-down organizing" effect in *any* subcontracting agreement, including those which all parties must admit would be valid and within the proviso. When there are union workers on the job next to nonunion workers, the enforcement of a subcontracting clause is still likely to have a top-down organizing effect. The answer to this point is simply that Congress recognized that the community of interests on the jobsite justified the top-down organizational consequences that may attend the protection of legitimate collective bargaining objectives there. The proviso is, after all, an exception to the general thrust of the 1959 amendments.[36]

The *Connell* opinion's condemnation of the "unlimited" top-down organizing weap-

---

**34.** Indeed, *National Woodwork* contains a footnote reference succeeding the discussion of the "close community of interests" on the jobsite. 386 U.S. at 639 n. 32, 87 S.Ct. at 1265 n. 32. That footnote refers to *Essex County and Vicinity District Council of Carpenters and Millwrights v. NLRB,* 332 F.2d 636 (3d Cir. 1964), which does deal with shoulder-to-shoulder friction. It also refers, however, to a Yale Law Journal Comment. *The Impact of the Taft-Hartley Act on the Building and Construction Industry,* 60 Yale L.J. 673, 684–89 (1951), which discusses not only jobsite friction but also the additional considerations of interchangeability of workers, short time span, flexible contracting arrangements, and numerous other interests that a union representing a primary group of employees may have in the employment arrangements of other employees at the jobsite.

**35.** Essentially the same situation was dealt with by this court in *ACCO Construction Equipment, Inc. v. NLRB,* 511 F.2d 848 (9th Cir. 1975). *ACCO* does contain language tending to restrict the jobsite proviso to the goals of avoiding shoulder-to-shoulder friction, but we do not read that as essential to its decision. *ACCO* was written before *Connell* and it dealt with what were essentially off-site workers who only occasionally worked on-site. They and their employers were not at all involved in the "community of interest" which are emphasized in *National Woodwork, Connell,* and this opinion. The union's objectives in organizing such off-site workers were indirect and wholly secondary; the primary interests of workers in the bargaining unit at the jobsite could not be directly affected by, and were not interchangeable with, the off-site workers.

**36.** Because the proviso *is* an exception to the 1959 amendments, we cannot accept the test for its interpretation adopted at the conclusion of Judge Sneed's dissent, 654 F.2d at 1327. The issue is not which interpretation is the more faithful to Congress' overall goal in the 1959 amendments of curbing "top-down" organizing. Instead, the question is which interpretation best effectuates Congress' accommodation of the conflicting objectives of curbing "top-down" organizing and of protecting collective bargaining under the peculiar conditions of the construction industry.

on with which it was confronted must be read in the context of the applicable factual and statutory framework. Because the union in *Connell* disclaimed any interest in organizing or representing Connell's employees, its picketing was not limited to the 30 days established for organizational picketing under § 8(b)(7). It could therefore picket indefinitely to obtain its objective of a subcontracting agreement covering all subcontracting by Connell. If the subcontractor clause were held to be legitimate, there would be no limit at all to the coercive force the union could apply. The decision in *Connell* solved this problem by holding that the subcontracting agreement was an unlawful goal when it was sought outside of a collective bargaining context.

The situation is quite different when a union seeks a subcontractor clause in the context of a collective bargaining relationship. In that situation, the union's coercive force is limited. If the clause is sought in the course of organizational or recognitional picketing, that picketing will be subject to the restrictions of § 8(b)(7). If the union already represents the contractor's employees, the employer may resist any attempts to secure a subcontractor agreement by asserting its own bargaining position and presenting its own demands. The existence of a collective bargaining relationship therefore avoids the "unlimited" nature of the organizational tool involved in *Connell*, where a stranger contractor was powerless to resist unlimited coercion by any means other than signing the demanded subcontractor agreement.

■ Finally, in summarizing the proviso's effect, the *Connell* Court stated:

[W]e think its authorization extends only to agreements in the context of collective bargaining relationships and, in light of congressional references to the *Denver Building Trades* problem, possibly to common-situs relationships on particular job-sites as well.

*Id.* at 633, 95 S.Ct. at 1840. While it might be susceptible to another reading, we interpret this language to mean that the existence of a collective bargaining relationship *clearly* brings a union signatory subcontracting agreement within the proviso to § 8(e) and that in the absence of a collective bargaining relationship, it is possible that such an agreement may be valid where the union actually has workers on the job that may be threatened with shoulder-to-shoulder friction.[37] We consequently believe that the quoted summary supports our conclusion that *Connell* does not deny the protection of the proviso to the subcontractor agreements in the present cases.

**(B)** *Practical Consequences.*

Our reading of *Connell* to permit broad subcontracting clauses within a collective bargaining relationship not only accords with the apparent thrust of the legislative history, it is supported by the severe practical limitations attending a contrary conclusion. Limitation of subcontracting agreements to sites where there may be shoulder-to-shoulder conflict between union and nonunion workers presents immense practical problems. If unions are confined to negoti-

---

37. Our reading of the quoted language in *Connell* as presenting disjunctive alternatives rather than conjunctive and cumulative requirements is supported by the District of Columbia Circuit and probably by the Third Circuit. *Donald Schriver, Inc., supra; Larry V. Muko, Inc. v. Southwestern Pennsylvania Building & Construction Trades Council,* 609 F.2d 1368, 1374–75 (3d Cir. 1979) (en banc). Lower courts and commentators have varied in their approach to the underlying issue. *See Landscape Specialties, Inc. v. Laborers' International Union, Local 806,* 477 F.Supp. 17 (C.D.Cal. 1979); *Long v. Floorcraft Carpet Co.,* 82 Labor cases ¶ 10,044 (D.Or.1977); St. Antoine, *supra,* 62 Va.L.Rev. at 619; Janofsky & Hay, *Connell—Consistent with Past, Indicative of Future,* Proceedings of N.Y.U. Twenty-Ninth Annual Conference on Labor 3, 21–22 (1976).

Normally, a union without a collective bargaining relationship that seeks a subcontracting clause will be pursuing no interest that could impact upon its primary representation of anyone. The rare exception might occur when the union has its own employees working for some other employer on the jobsite and shoulder-to-shoulder friction threatens.

ating these agreements only when they find that there are union employees on the jobsite, then they must inventory and negotiate over an incredible number of jobsites. AGC itself represents some 200 general contractors. The number of jobsites at which they contract is unquestionably a multiple of that figure. Jobsite by jobsite negotiation of subcontracting agreements would seem burdensome to the point of impossibility. It also appears to run counter to Congress's accommodation in § 8(f) to the necessity in the industry of entering long term agreements applying to employees not yet hired for jobs not yet in existence. S.Rep.No. · 187, 86th Cong., 1st Sess.· 28 (1959); I Leg.Hist. 424.

Even if general subcontracting agreements are permitted to be negotiated wholesale and then are triggered only when union workers appear on the job, the enforcement problems remain severe. The transitory nature of employment at each jobsite, as well as the difficulty of defining the applicable time span during which jobsite conflict is threatened, present substantial problems.[38] If a rule is adopted that the appearance of any union worker on the job triggers subcontracting agreements covering the entire project, it presents an especially strong incentive for anti-union discrimination by employers.

We are presented, then, with a number of practical and theoretical considerations supporting our decision that the present subcontracting agreements, arrived at in the

context of collective bargaining relationships, are within the proviso of § 8(e). First, there are overwhelming practical difficulties in confining the subcontractor agreements to jobsites where actual union-nonunion or interunion conflict occurs among workers. Second, the legislative history as well as the actual conditions existing in the construction industry militate in favor of broad subcontractor clauses in collective bargaining agreements. Third, the *Connell* decision, which admittedly has language that might point to either result, may fairly be read to support the validity of subcontracting clauses when there is a collective bargaining relationship, regardless of the presence or absence of union workers at the jobsite.

 Given these considerations, we reject a narrow interpretation of the proviso which will substantially change the existing practice in the industry. In addition, we believe that due regard should be given to the view of the National Labor Relations Board supporting these agreements.[39] It is true that the position of the agency has not been an unwavering one,[40] but the Board's articulation of current labor policy is undoubtedly entitled to weight in our decision.

## VI.

*Additional Issues.*

 It is contended by AGC that even if the construction industry proviso authorizes

---

**38.** Judge Sneed in the dissent makes the point that even under our decision, unions must police jobsites to ensure compliance with subcontractor clauses. We believe that it is a more manageable task, however, to police jobsites to ensure that subcontractors working there have agreements with the policing union than it is to determine whether any union worker has been working on the jobsite at any time, or perhaps at any time when that worker's presence might lead to jobsite friction.

**39.** *NLRB v. Yeshiva University,* 444 U.S. 672, 691, 100 S.Ct. 856, 867, 63 L.Ed.2d 115 (1980). Compare *Beth Israel Hospital v. NLRB,* 437 U.S. 483, 500–01, 98 S.Ct. 2463, 2473, 57 L.Ed.2d 370 (1978), *and NLRB v. International*

*Association of Bridge, Structural & Ornamental Iron Workers,* 434 U.S. 335, 350–51, 98 S.Ct. 651, 660–61, 54 L.Ed.2d 586 (1978), *with NLRB v. International Longshoremen's Association,* 447 U.S. 490, 100 S.Ct. 2305, 65 L.Ed.2d 289 (1980).

**40.** *See International Union of Operating Engineers, Locals 542, 542–A and 542–B, (York County Bridge, Inc.),* 216 N.L.R.B. 408, 409 (1975), *enforced,* 532 F.2d 902 (3d Cir. 1976), *cert. denied,* 429 U.S. 1072, 97 S.Ct. 808, 50 L.Ed.2d 789 (1977); General Counsel Memorandum, note 25, *supra.*

clauses requiring subcontractors to have agreements with unions in general, it does not permit clauses to require a collective bargaining agreement with a particular union. We note, however, that nothing in the language of the § 8(e) proviso suggests such a limitation, even though "particular-union" clauses were a part of industry practice at the time of its enactment. Two months prior to the creation of the proviso, the District of Columbia Circuit upheld a "particular-union" subcontractor agreement in a decision that was submitted to the House committee considering the 1959 amendments. *Operating Engineers Local Union No. 3 v. NLRB, supra*; 2 House Hearings 803–07. In the light of this history, we do not feel free to find in the proviso a limitation not written there by Congress. We are joined in this conclusion by the District of Columbia Circuit in *Donald Shriver, Inc. v. NLRB, supra*, 635 F.2d at 884–886. We also note that prohibition of "particular-union" subcontractor clauses would defeat at least some of the interests that we earlier found to be served by the construction industry proviso. One such interest is that of a union in protecting the wages and benefits of its members in the primary bargaining unit who may later work for subcontractors. That concern is shared by no other union, and is best served by a "particular-union" clause.

■ It is next contended, this time by Woelke, that even if a subcontractor agreement is protected by the construction industry proviso, it is an unfair labor practice for a union to picket or strike in order to induce a contractor to enter such an agreement. The legislative history of the 1959 amendments is in conflict on this point.[41] The actual wording of § 8(b)(4)(ii)(A), however, prohibits coercion of any person "*to enter into any agreement which is prohibited by* [§ 8(e)]."[42] The negative implication of this provision is surely that picketing or striking to induce entry into an agreement protected by the proviso to § 8(e) is lawful.

After the 1959 amendments, the Board originally took the position that such agreements had to be voluntarily entered, but its position was uniformly rejected by this and other courts of appeals. *Construction Production & Maintenance Laborers Union, Local 383 v. NLRB, (Colson & Stevens Construction Co.)*, 323 F.2d 422 (9th Cir. 1963); *Orange Belt District Council of Painters No. 48 v. NLRB*, 328 F.2d 534, 537 (D.C.Cir. 1964); *Essex County and Vicinity District Council of Carpenters and Millwrights v. NLRB*, 332 F.2d 636 (3d Cir. 1964). The Board subsequently acquiesced in the courts' view. *Northeastern Indiana Building & Construction Council*, 148 N.L.R.B. 854 (1964), *remanded on other grounds*, 352 F.2d 696 (D.C.Cir. 1965). We see no reason to disturb the present law and to read into the Act a limitation that runs counter to the suggestion of its plain words. Nor do we accept the contention that picketing or striking to obtain a subcontractor agreement violates the § 7 rights of employees of subcontractors; they are no more affected by a subcontractor agreement achieved by picketing than by one voluntarily entered.

■ The final issue concerns the effect of the provision in the AGC contract that permits each party to resort to self-help when the other party does not comply with an arbitration decision made pursuant to

---

**41.** Representative Barden, the Leader of the House conferees, referred to the proviso as permitting "voluntary agreements." 105 Cong. Rec. 18128; II Leg. Hist. 1715.

Senator Kennedy, the leader of the Senate conferees, appeared to be of the view that economic coercion was permissible, and stated that the proviso was not intended to change the law "with respect to the legality of a strike to obtain such a contract." 105 Cong.Rec. 17900, II Leg. Hist. 1433.

Senator Goldwater, one of the Senate conferees, and the man who may have been most responsible for the Landrum-Griffin Amendments, *see* 105 Cong.Rec. 15516, II Leg.Hist. 1552 (statement of Rep. Madden), said that the question was left open for the courts to decide. 105 Cong.Rec. 19772, II Leg.Hist. 1858.

**42.** (Emphasis supplied). Section 8(b)(4)(ii)(A) appears *supra* note 4.

the grievance procedure.[43] The Board concluded that these provisions authorized picketing or strikes to enforce the subcontractor agreement, and held that the contract was consequently unlawful. The rule that picketing or strikes may not be used to enforce subcontractor agreements arises from the fact that the 1959 amendments exempted the construction industry from § 8(e)'s prohibition against secondary boycott agreements, but did not exempt it from § 8(b)(4)(ii)(B), which forbids economic coercion to enforce such a boycott. The legislative history makes clear Congress's intent that subcontractor clauses entered pursuant to § 8(e) were to be enforced judicially rather than by self-help,[44] and this court has followed that view. *NLRB v. International Brotherhood of Electrical Workers*, 405 F.2d 159, 163–64 (9th Cir. 1968), *cert. denied*, 395 U.S. 921, 89 S.Ct. 1772, 23 L.Ed.2d 237 (1969). We have also held that such clauses may be enforced by arbitration. *La Mirada Trucking, Inc. v. Teamsters Local Union 166*, 538 F.2d 286 (9th Cir. 1976).

Engineers argue, without pressing the point strongly, that self-help to enforce an arbitration award that in turn enforces a subcontractor agreement is not unlawful. The picketing or strike, according to the Union, is simply enforcing the arbitration award and not the underlying agreement. We believe that acceptance of this contention would too easily circumvent the clear intent of Congress and would do violence to the plain words of § 8(b)(4)(ii)(B). Nor can we accept the suggestion of the Union that the AGC agreement must be construed to limit the self-help clause to self-help which is determined to be lawful. We must take the agreement to mean what it says. *Operating Engineers, Local No. 701 v. NLRB*, 578 F.2d 841, 842 (9th Cir. 1978); *Donald Schriver, Inc. v. NLRB*, 635 F.2d at 886–87.

## VII.

*Conclusion.*

We find that provisions in a collective bargaining agreement forbidding the signatory employer to subcontract work at a construction site to firms that do not have a contract with the signatory union are within § 8(e) of the National Labor Relations Act, but are protected by the construction industry proviso to that section. They need not be limited to jobsites presenting the possibility of conflict between union and nonunion workers. We also find that unions may picket or strike to induce employers to enter such agreements but that, once entered, the agreement may not be enforced by self-help. Clauses authorizing self-help enforcement, directly or through arbitration decisions, are consequently invalid. We accordingly enforce the orders of the Board in their entirety.

SNEED, Circuit Judge (with whom CHOY, ANDERSON and FARRIS, Circuit Judges, concur) dissenting:

As with many legal issues, where one ends up in this case depends upon where one starts. While I have no disagreement with the court's holding that union signatory clauses are secondary and within the scope of section 8(e), I respectfully dissent from its holding that such clauses are invariably within the construction industry pro-

---

**43.** *See* note 1, *supra.*

**44.** The Conference Committee, after stating that it did not intend the proviso to change existing law regarding subcontractor agreements, stated: "Picketing to enforce such contracts would be illegal under the *Sand Door* case *Local 1796, United Brotherhood of Carpenters v. NLRB*, 357 U.S. 93 [78 S.Ct. 1011, 2 L.Ed.2d 1186] (1958)." H.R.Rep. No. 1147, 86th Cong., 1st Sess. 39, [1959] U.S.Code Cong. & Admin.News, p. 2511; I Leg.Hist. 943. *See also*, 105 Cong.Rec. 17900, II Leg. Hist. 1433 (remarks of Sen. Kennedy). Senator Goldwater subsequently explained the proviso as follows: "The union may go into a court and sue [the contractor] if he fails to live up to that agreement. But they cannot strike or picket him to make him live up to it...." 105 Cong. Rec. A8359, II Leg.Hist. 1830.

viso to section 8(e) when a collective bargaining relationship exists between the employer and the union seeking the clause. The majority reaches its conclusion by commencing with the view that the construction industry presents unique problems in labor relations that require the legitimation of union signatory clauses. Although admitting that the legislative history is not compelling, the court finds that legitimation was provided by the construction industry proviso. My starting point, on the other hand, is with *Connell Construction Co. v. Plumbers & Steamfitters Local 100*, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975), and its concern with the "top-down" organizing effect of union signatory clauses. This concern led the panel before which this case was heard originally to hold as follows:

> "We hold that the construction industry proviso extends shelter only when a collective bargaining relationship exists and even then only when the employer or his subcontractor has employees who are members of the signatory union at work at some time at the jobsite at which the employer wishes to engage a nonunion subcontractor." *Pacific Northwest Chapter of the Associated Builders & Contractors, Inc. v. NLRB*, 609 F.2d 1341, 1347 (9th Cir. 1979).

I would adhere to that holding and to the reasons given by the panel therefor. *Id.* at 1348–50.

The court rejects the panel's result because it is said to represent an "even narrower" view of the construction industry proviso than that adopted by the Supreme Court in *Connell.* 654 F.2d 1320. Alleviation of "the frictions that may arise when union men work continuously alongside nonunion men on the same construction site," 421 U.S. at 630, 95 S.Ct. at 1839, is said not to have been a concern of the Supreme Court in *Connell* because in that case "the union did not purport to represent *any* of the interests served by the proviso." 654 F.2d 1320. Presumably this is because

there was no collective bargaining agreement between the employer and union in that case.

As I see it, the crucial language in *Connell* is as follows:

> "We therefore hold that this agreement, which is outside the context of a collective-bargaining relationship and not restricted to a particular jobsite, but which nonetheless obligates Connell to subcontract work only to firms that have a contract with Local 100, may be the basis of a federal antitrust suit because it has a potential for restraining competition in the business market in ways that would not follow naturally from elimination of competition over wages and working conditions." 421 U.S. at 635, 95 S.Ct. at 1841.

This language, as the majority acknowledges, is not entirely unambiguous. It is, however, not inconsistent with the panel's holding as set out above; and, more importantly, that holding is more empathetic with *Connell*'s concern with the "top-down" organizing effect of union signatory clauses than is that of the majority.

It is true, as the majority states, that any union signatory clause has some "top-down" organizing effect. The difference between the panel's holding and that of the en banc court lies in the scope of this effect. The en banc court permits a clause that forbids subcontracting work covered by the collective bargaining agreement to any firm not having a contract with the signatory union. It matters not whether any of the employees of the signatory employer, who are members of the signatory union, are employed on the jobsite. It matters not that, in the absence of the union signatory clause, the work could have been subcontracted to a firm which, even though adhering to union standards governing wages and working conditions, was more efficient than its competitors.

It must be acknowledged that the panel's holding would not greatly diminish the "top-down" organizing effect of the union

signatory clause. It would permit the choice of the more efficient firm only when to do so would entail no jobsite friction between members of the signatory union and workers performing work covered by the collective bargaining agreement. Thus, a provision in the agreement precluding subcontracting of all the covered work would prevent choice of the more efficient firm and thus provide a substantial "top-down" organizing effect. A clause prohibiting subcontracting is permissible. *National Woodwork Manufacturers Association v. NLRB*, 386 U.S. 612, 644–46, 87 S.Ct. 1250, 1268–69, 18 L.Ed.2d 357 (1967); *see also Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964); *NLRB v. Johnson*, 368 F.2d 549 (9th Cir. 1966). However, the panel's holding would afford an opportunity by which an employer could accept a union signatory clause without sacrificing all right to choose the more efficient subcontractor. Preservation of this opportunity would be more consistent with the primary concern of *Connell* than is the position of the en banc court. I doubt that the en banc court seriously contends otherwise. It does believe that the preservation of this opportunity would provide a "strong incentive for anti-union discrimination by employers." 654 F.2d 1322. I am dubious. Under either view an anti-union employer will strive to avoid a union signatory clause. That an employer under the panel's view would have a limited opportunity to subcontract to a firm not having an agreement with the signatory union is not likely to make it more anti-union.

I agree with the en banc court that the legislative history of the construction industry proviso is not conclusive. We have previously considered the legislative history of the proviso. *ACCO Construction Equipment, Inc. v. NLRB*, 511 F.2d 848, 851 (9th Cir. 1975). In surveying the legislative history, we concluded that the dominant motive of Congress in adopting the proviso was to permit agreements that aimed at eliminating jobsite friction between union and nonunion workers. *Id.* at 851; *accord,*

*Drivers Local 695 v. NLRB*, 361 F.2d 547, 553 (D.C.Cir.1966); *Essex County District Council of Carpenters v. NLRB*, 332 F.2d 636, 640 (3d Cir. 1964). And the National Labor Relations Board previously believed: "[T]he 8(e) proviso was intended to prevent labor strife among nonunion and union employees at the same jobsite." *International Union of Operating Engineers, Locals 542, 542–A and 542–B*, 216 N.L.R.B. 408, 409 (1975), *enforced*, 532 F.2d 902 (3d Cir. 1976), *cert. denied*, 429 U.S. 1072, 97 S.Ct. 808, 50 L.Ed.2d 789 (1977). I see no reason to depart from our earlier analysis of the purpose of the proviso.

Admittedly, Senator Kennedy thought that the construction industry proviso would permit subcontracting clauses such as those challenged in these cases. Others argued that the proviso was intended to permit agreements not to use prefabricated pipe unless union workers did the fabricating. 105 Cong.Rec. 19785–86, 19809 (1959); II Leg.Hist. 1815–16 (extension of remarks of Senator McNamara and Representative Thompson); *contra* 105 Cong.Rec. 20004–05 (1959); II Leg.Hist. 1861 (extension remarks of Representative Kearns). But neither of these purposes were clearly understood as the reason for the proviso. As *Connell* and *ACCO* concluded, the legislative history supports the conclusion that most congressmen thought the proviso was intended to address the problem of jobsite friction. *See, e. g.*, I Leg.Hist. 82 (message from President Eisenhower to Congress); 105 Cong.Rec. 15852, II Leg.Hist. 1684 (statement of Congressman Goodell); 105 Cong.Rec. 17333–34, II Leg.Hist. 1383–84 (proposed instructions for Senate conferees). Also, as I read the excerpt from the memorandum by Representatives Thompson and Udall quoted by the en banc court, 654 F.2d 1319, it too strongly supports the conclusion that the proviso was aimed at the jobsite friction problem. The references to employees working "side by side" on a "single building" so indicate. 105 Cong.Rec. 15541 (1959); II Leg.Hist. 1577.

The en banc court notes that some subcontractor clauses similar to those chal-

lenged in these cases existed in 1959. Since they conclude that the Congress intended to preserve the law relating to the construction industry as it then existed, the court argues that Congress intended that the proviso would protect broad subcontractor clauses. I believe this reasoning gives far too much weight to the bare reference to the pattern of collective bargaining referred to in the Committee Report. *See Connell, supra*, 421 U.S. at 628–29, 95 S.Ct. at 1838. Furthermore, the lawfulness and permissible scope of subcontractor agreements had not been conclusively determined in 1959. And the proviso clearly changed the law by explicitly limiting its protection to jobsite work. That limitation at least partially overruled the *Sand Door* case, *Local 1976, United Brotherhood of Carpenters v. NLRB*, 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958). Thus the most that can be said is that Congress intended to preserve the existing law within the scope of the proviso. That proposition, however, begs rather than answers the question of what the proper scope of the proviso is. That is what this case is about. Our decision, whatever it is, can draw but little comfort from the legislative history.

The majority also argues that practical considerations favor the result they reach. But the practical problems of following the panel's decision would not have been severe. If broad subcontractor clauses are approved, unions must still police construction sites to ensure compliance. No more is required by a rule limiting subcontractor clauses to jobsites at which members of the signatory union are employed. The serious practical problems raised by the majority would arise only if subcontractor clauses were required to be renegotiated on a jobsite by jobsite basis, but that would not be required by the panel's interpretation of the proviso.

Thus, we come to the nub of the matter. Which interpretation of the proviso is more faithful to curbing "top-down" organizing, which, it must be remembered, was Congress's objective in adopting the 1959 Act which included section 8(e). *Connell, supra*, 421 U.S. at 632–33, 95 S.Ct. at 1840. The holding of the panel gets my nod.[1]

FARRIS, Circuit Judge, with whom CHOY and J. BLAINE ANDERSON, Circuit Judges, join, dissenting:

I join Judge Sneed's dissent in all respects and add some comments regarding the scope of the construction industry proviso.

The collective bargaining agreements here prohibit signatory general contractors from subcontracting any work covered by the agreement at any construction site to nonsignatory contractors. These agreements violate subsection 8(e) of the National Labor Relations Act, 29 U.S.C. § 158(e) (1976), unless they are permitted under the construction industry proviso, which allows "agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction . . . ." *Id.* The precise issue here is whether that proviso legalizes agreements that limit subcontracting at sites where the employer has no employees represented by the union. The majority holds that it does. I disagree.

In *Connell Construction Co. v. Plumbers Local 100*, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975), the Supreme Court concluded that the construction industry proviso did not authorize a construction industry employer and a union not representing its employees to agree to limit the employer's right to subcontract. Finding no congres-

---

1. Because the panel concluded that the broad subcontractor clause in the AGC agreement violated section 8(e), it did not address the lawfulness of the agreement's self-help enforcement provision. 609 F.2d at 1351. I agree with the majority of this en banc court that the

self-help enforcement provision must be interpreted to mean what it says and that Congress clearly intended that subcontractor clauses were to be enforced judicially rather than by strikes or picketing. Therefore, I agree that the self-help clause in the AGC contract is invalid.

sional purpose in extending the proviso to legalize agreements between employers and "stranger" unions, the Court narrowly construed the proviso to limit its scope "to agreements in the context of collective-bargaining relationships and ... possibly to common-situs relationships on particular jobsites as well." *Id.* at 633, 95 S.Ct. at 1840.

Here, the three judge panel concluded that the proviso was designed to deal with the special problem of jobsite friction in the construction industry. It read the proviso to allow a collective bargaining agreement to restrict an employer's subcontracting at the jobsite where it employs the union's members. The majority asserts that another purpose—maintenance of contract standards in the industry—requires that the proviso be read to allow restrictions on the use of nonsignatory subcontractors at any jobsite. *See also Donald Shriver, Inc. v. NLRB,* 635 F.2d 859, 879–82 & n.29 (D.C. Cir. 1980). I agree that a congressional purpose in addition to reduction of jobsite friction may require a broader scope for the proviso, but I do not agree that maintenance of contract standards in the industry is such a purpose. The Court in *Connell* read the proviso to allow restraints in the context of collective bargaining relationships. That does not mean that when a relationship exists *any* restraint can be imposed; rather, the relationship only has a bearing on the legality of the restraint when the relationship and the restraint are related. It is not sufficient that the restraint serves the interest of workers in the industry generally. It must serve the interests of the workers represented by the union in the course of their employment by the employer.

The only way the all-jobsite restraints here can serve the interests of these workers is by preventing loss of work due to subcontracting. This problem, however, is resolved by a common, *primary* restraint: the union standards clause. Such clauses effectively insulate workers from falling in-

dustry standards by removing the incentive to subcontract. At the same time they avoid many of the evils inherent in the restraints here. In my view the construction industry proviso is not concerned with maintenance of contract standards. *See generally* Archibald Cox, Derek Bok & Robert Gorman, *Cases and Materials on Labor Law* 892–95 (8th ed. 1977) (while garment industry proviso was concerned with maintenance of industry standards, construction industry proviso was concerned with jobsite friction). The proviso should not be read to permit restraints which extend to jobsites where no unit employees are present and which are therefore unrelated to reduction of jobsite friction.